468 So.2d 1142 (1985)
STATE of Louisiana
v.
Jan J. PORRETTO.
Nos. 82-KA-1226, 82-KA-1266.
Supreme Court of Louisiana.
May 14, 1985.
*1144 William J. Guste, Jr., Atty. Gen., Barbara Rutledge, Asst. Atty. Gen., John M. Mamoulides, Dist. Atty., William "Chuck" Credo, Louise Korns, Steve Little, and Cornelius Regan, Asst. Dist. Attys., for plaintiff-appellee.
Ralph S. Whalen, Jr., New Orleans, for defendant-appellant.
MARCUS, Justice.
Jan J. Porretto was indicted by the grand jury with the first degree murder of Arthur W. Bohmfalk. At trial, the jury was unable to agree upon a verdict and a mistrial was declared. Thereafter, the indictment was amended to charge defendant with second degree murder. Defendant was also charged by bill of information with attempted second degree murder of Joan Bohmfalk. Both charges were consolidated for trial. After trial by jury, defendant was found guilty of second degree murder and aggravated battery. He was sentenced to life imprisonment at hard labor without benefit of parole, probation, or suspension of sentence on the second degree *1145 murder conviction and to serve ten years and pay a fine of $5,000 on the aggravated battery conviction, the sentences to run consecutively. On appeal, defendant relies on seventeen assignments of error for reversal of his convictions and sentences.[1]

ASSIGNMENT OF ERROR NO. 1
Defendant contends the trial judge erred in denying his motion for a new trial grounded on the claim that the evidence was insufficient to support his convictions for the second degree murder of Arthur W. Bohmfalk and the aggravated battery of Joan Bohmfalk.[2]
Shortly after 10:00 at night on September 13, 1979, Joan Bohmfalk left her Kenner home to pick up her daughter and son-in-law. The threesome were attending the midnight show at the Fairmont Hotel's Blue Room. Her husband, Dr. Arthur W. Bohmfalk, did not accompany them and remained at home. During the evening, Mrs. Bohmfalk agreed to lend her daughter and son-in-law her son's red and white Monte Carlo which was parked at the Bohmfalk residence. Upon arriving home at about 3:00 a.m., Mrs. Bohmfalk and her son-in-law found the Monte Carlo missing. Dr. Bohmfalk had been in the habit of driving the car since he had it repaired for his son. His son had also stored several green surgical scrub shirts given to him by his father in the car. Mrs. Bohmfalk then brought her son-in-law home, returned to her house at 4:00 a.m., and went immediately to bed.
After his wife's departure that evening, Dr. Bohmfalk also left home. He cashed a $25 check at Sal and Sam's Restaurant on Veterans Boulevard a few minutes after 1:00 a.m. and eventually proceeded to Gino's Speakeasy in Fat City. Dr. Bohmfalk took a seat at the bar and struck up a conversation with the bartender, John Senac. Senac noticed that Dr. Bohmfalk was wearing "an expensive gold nugget watch and some chains."[3] At some point in the conversation, Jan Porretto took a seat next to Dr. Bohmfalk and Senac introduced the two men to each other but, on a sign from Porretto, did not mention that defendant, who was not in uniform, was a New Orleans policeman. Dr. Bohmfalk and Porretto took turns buying each other drinks. After about an hour had passed, Dr. Bohmfalk paid his bill and went to the restroom. Porretto then paid his bill and warned Senac "to forget [he] ever saw the doctor." At about 2:30 or 3:00 a.m., Porretto and Dr. Bohmfalk left Gino's Speakeasy together.
At 4:20 that morning, Anthony Szczepura, who was awake in his second floor apartment next to the Knights of Columbus parking lot near Veterans Boulevard, distinctly heard a gunshot. Five minutes later, he looked around outside but saw nothing. At 5:00 that same morning, Mrs. Bohmfalk was awakened by the barking of her dogs and the ringing of the door bell. Turning on the chandelier in the foyer, she descended down the stairs. On her way to the front door, she saw a man looking through the three-pane window on the side of the door. The man had on a green surgical scrub shirt and a navy blue coat. He motioned her to open the door. She did and he came inside. The man stated that he was an assistant coroner and that he had come to tell her that her husband had committed suicide. Mrs. Bohmfalk became upset and when she went upstairs to put on a robe and call her daughter, the man followed her saying that he would like to look around. As Mrs. Bohmfalk sat down on her bed and began to dial her daughter's number, the man suddenly struck her several tremendous blows in the head. As she *1146 was losing consciousness, she felt him slipping off her rings. Mrs. Bohmfalk was hospitalized for severe head and face injuries. Her treating physician testified that, absent quick medical treatment, Mrs. Bohmfalk's injuries could have been life threatening because of the bleeding that was going on in a brain wound she received. Mrs. Bohmfalk later identified the man who attacked her as Jan Porretto.
About 7:15 a.m., Detective Russell Hidding of the Jefferson Parish Sheriff's office responded to a radio call that the body of a white male had been found lying face down in the parking lot of the Knights of Columbus. The body, which was later identified as that of Dr. Bohmfalk, had a single gunshot wound in the head. No identification was found and the only jewelry recovered from the body were two necklaces. No gun was found at the scene. The next day, the red and white Monte Carlo which Dr. Bohmfalk had been in the habit of driving was found in the 1300 block of Helios Avenue in Metairie. The .38 caliber bullet which was removed from Dr. Bohmfalk's head was shown to have come from a gun that Jan Porretto had in his possession on May 3, 1979 (about five months before the murder) and on March 8, 1980 (a little over five months after the murder). The gun was owned by defendant's father, a retired policeman, and was often kept on a mantel in his home. Defendant's brothers, Joel and Peter Porretto, indicated that everybody in the house had access to the gun and had used it at one time or another. However, on rebuttal, the state entered into evidence a transcript from defendant's bail hearing where defendant stated on cross-examination that he had possession of the gun on the night of the murder.
The constitutional standard for testing the sufficiency of evidence, enunciated in Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), requires that a conviction be based on proof sufficient for any rational trier of fact, viewing the evidence in the light most favorable to the prosecution, to find the essential elements of the crime charged beyond a reasonable doubt. When circumstantial evidence is used to prove the commission of the offense, La.R.S. 15:438 mandates that "assuming every fact to be proved that the evidence tends to prove, in order to convict, it must exclude every reasonable hypothesis of innocence." This is not a purely separate test from the Jackson standard to be applied instead of a sufficiency of the evidence test whenever circumstantial evidence forms the basis for the conviction. Ultimately, all evidence, both direct and circumstantial, must be sufficient under Jackson to satisfy a rational juror that the defendant is guilty beyond a reasonable doubt. Due process requires no greater burden. State v. Wright, 445 So.2d 1198 (La.1984).
In the instant case, sufficient evidence was adduced for a rational trier of fact to conclude beyond a reasonable doubt that defendant specifically intended to kill Dr. Bohmfalk while engaged in the perpetration or attempted perpetration of armed robbery or simple robbery. Defendant was seen with Dr. Bohmfalk on the morning he was killed by a bartender who was warned by defendant to forget that he ever saw the doctor. At 4:20 a.m., a gunshot was heard by a resident of an apartment building adjacent to the parking lot where Dr. Bohmfalk's body was found. Less than an hour later, defendant appeared at the Bohmfalk residence dressed in a green surgical scrub shirt similar to those stored in the car that Dr. Bohmfalk had been driving. Defendant identified himself as an assistant coroner and informed Mrs. Bohmfalk about her husband's death. Later that morning, Dr. Bohmfalk's body was found with a single gunshot wound in the head. The doctor's gold Rolex watch was not found on his body. Dr. Bohmfalk was killed by a bullet fired from a gun known to have been used by defendant about five months earlier. Under the circumstances presented, we conclude that a rational jury could have determined that the evidence excluded every reasonable hypothesis of innocence.
*1147 At trial, defendant did not object to the inclusion of aggravated battery as a responsive verdict to the charged offense of attempted second degree murder of Mrs. Bohmfalk. When the defendant fails to interpose a timely objection to a legislatively responsive verdict, this court will not reverse the conviction if the jury returns such a verdict, whether or not that verdict is supported by the evidence, as long as the evidence is sufficient to support the offense charged. State ex rel. Elaire v. Blackburn, 424 So.2d 246 (La.1982), cert. denied, 461 U.S. 959, 103 S.Ct. 2432, 77 L.Ed.2d 1318 (1983). The evidence adduced revealed that upon entering the Bohmfalk residence, defendant beat Mrs. Bohmfalk into unconsciousness with several tremendous blows to the head and then took her rings. Mrs. Bohmfalk suffered severe head and face injuries as a result of the attack. Consequently, there was sufficient evidence for a rational trier of fact to convict defendant of attempted second degree murder.
Accordingly, the trial judge did not err in denying the motion for a new trial on the ground that the evidence was insufficient to support the convictions. Assignment of Error No. 1 is without merit.

ASSIGNMENT OF ERROR NO. 5
Defendant contends the trial judge erred in admitting in evidence the transcript of his testimony at the hearing on the motion to set bail. He argues that he was improperly compelled to forfeit his fifth amendment right to remain silent in order to safeguard his constitutional right to bail.
After indictment for first degree murder, defendant, represented by counsel, testified on his own behalf at the hearing on the motion to set bail. After the state had rested during the second trial, two of defendant's brothers, Joel and Peter Porretto, testified that the gun used to kill Dr. Bohmfalk belonged to their father and was kept in his house where everyone had access to it. The brothers stated that both of them, their father, and defendant had used the gun at one time or another. In rebuttal, the state offered in evidence, over defendant's objection, a transcript of defendant's testimony at the bail hearing where among other things defendant stated that he had possession of the gun on the night of the murder.
In Simmons v. United States, 390 U.S. 377, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968), the United States Supreme Court held that incriminating testimony given on a motion to suppress evidence on fourth amendment grounds is inadmissible at trial on the issue of guilt. In that case, it was necessary for a defendant to admit ownership of a piece of inculpatory evidence in order to have standing to object to its admission on fourth amendment grounds. The Court was concerned that a defendant who knew that his testimony would be admissible against him at trial would be deterred from presenting the testimonial proof of standing necessary to assert his fourth amendment claim. Under these circumstances, the Court determined that a defendant was not required to surrender his fifth amendment privilege against self-incrimination in order to preserve a fourth amendment claim. However, an extension of the Simmons rationale to exclude at trial a defendant's testimony at a bail hearing was rejected in United States v. Dohm, 618 F.2d 1169 (5th Cir.1980). The court in Dohm noted that the testimony required at a fourth amendment suppression hearing differs in nature from that required at a bail bond hearing. A defendant at a bail bond hearing need not divulge the facts in his case in order to receive the benefits of bail.
Defendant contends that Dohm's rationale is inapplicable to the instant case because after his indictment for a capital offense, the burden of proof was on him to show that the proof was not evident or the presumption was not great that he was guilty. See La.Code Crim.P. art. 313(2). Accordingly, he was compelled to testify as to the facts in his case in order to safeguard his right to bail. We need not decide this question because in the instant case the state used defendant's bail hearing testimony to rebut testimony offered by defense *1148 witnesses which put into question whether or not defendant had possession of the gun on the night of the murder. See La.R.S. 15:282. As defendant's testimony was used only in rebuttal, the trial judge did not err in admitting it in evidence. In any event, we conclude that there was no reasonable possibility that the admission of defendant's testimony on rebuttal could have contributed to the conviction. Furthermore, the state's proof that defendant was the murderer was very strong and in no way dependent upon the introduction of defendant's testimony. Hence, even if it was error to admit this evidence, it was harmless beyond reasonable doubt. Chapman v. California, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967); State v. Gibson, 391 So.2d 421 (La.1980).

ASSIGNMENT OF ERROR NO. 6
Defendant contends the trial judge erred in refusing to allow part of Paul Clark's testimony and all of Don Larroque's testimony to go before the jury. He argues that the excluded testimony supported his theory that John Senac and Clark were involved in Dr. Bohmfalk's murder and was relevant to Senac's credibility.
On cross-examination, state witness John Senac admitted sharing a house with a jeweler friend of his, Paul Clark, but Senac denied having a homosexual relationship with Clark. Thereafter, defendant sought to impeach Senac by calling as witnesses Clark and Larroque in order to show the existence of a homosexual relationship. As an offer of proof, the two witnesses were allowed to testify out of the jury's presence. Larroque essentially testified that Senac and Clark lived together as homosexual lovers for about a year in 1977. Clark admitted that he lived with Senac for about one year but denied that they were homosexual lovers. Later, defendant was allowed to examine Clark before the jury so that they could compare any similarities between Clark and a painting that Mrs. Bohmfalk had made of her attacker. Clark also testified before the jury that he was a jeweler and had lived with Senac for about one year.
Each side has the right to impeach the testimony and the credibility of every witness sworn on behalf of the other side. La.R.S. 15:486. However, it is not competent to impeach a witness as to collateral facts or irrelevant matter. La.R.S. 15:494. Also, it is generally accepted that the trial judge should exclude circumstantial evidence, even though logically relevant, if its probative value is outweighed by the risk that its admission will consume too much time, unnecessarily confuse the jury concerning the issues to be determined, tend to excite the emotions of the jury to the undue prejudice of the opponent, or unfairly surprise the opponent. State v. Ludwig, 423 So.2d 1073 (La.1982).
The jury was allowed to observe any similarities between Clark and the painting of Mrs. Bohmfalk's attacker and hear Clark's testimony that he was a jeweler and had lived with Senac for about a year. The only testimony excluded from the jury was that attempting to establish the existence of a homosexual relationship between Senac and Clark. Arguably, this evidence was relevant to the defense theory that both men were involved in the murder; however, the probative value of such evidence is so outweighed by the danger of unfair prejudice, confusion of the issues to be determined, and undue delay that it was properly excluded. Likewise, it was also properly excluded for impeachment purposes.
Assignment of Error No. 6 is without merit.

ASSIGNMENTS OF ERROR NOS. 14, 15, 16 AND 17
Defendant contends the trial judge erred in denying his motion for a new trial. He argues that the state's failure to disclose exculpatory evidence, consisting of Joan Bohmfalk's statements while under hypnosis, deprived him of his constitutional right to a fair trial. He further argues that Mrs. Bohmfalk's identifications of him should *1149 have been excluded at trial as they were improperly enhanced at the hypnotic session.
The day after she was attacked, Mrs. Bohmfalk gave police a description of her attacker from her hospital bed. According to Detective Hidding's trial testimony, Mrs. Bohmfalk then described her attacker as 45 to 50 years old, 5 feet-6 inches to 5 feet-8 inches tall, medium build, 152-170 pounds, short, choppy dark "Hitler-looking" hair combed to the side, and wearing a green surgical shirt and a blue blazer. Over the course of the next ten months, Mrs. Bohmfalk viewed between ten and fifteen photographic lineups presented by Detective Hidding. She also viewed mug shot books kept on file at the Jefferson Parish Sheriff's office. During this period, no identification was made by her. On December 28, 1979, Mrs. Bohmfalk submitted to a hypnotic session conducted by Lieutenant Walter Gorman of the Jefferson Parish Sheriff's office. During this session, Mrs. Bohmfalk described her attacker as wearing a brown flight jacket and hat. A second hypnotic session was conducted by one of Mrs. Bohmfalk's personal physicians but was terminated as soon as Mrs. Bohmfalk went under hypnosis because she became hysterical. About six months after the first hypnotic session, the police received an anonymous letter and for the first time defendant became a suspect in the case. On July 7, 1980, Detective Hidding presented to Mrs. Bohmfalk a lineup of five photographs including, for the first time, a photograph of defendant. She selected defendant's photograph and wrote on its back "this appears very similar to the man who attacked me." Later, on July 15, 1980, Mrs. Bohmfalk attended a physical lineup and upon observing defendant she immediately became visibly shaken. She positively identified defendant as the man who attacked her. Despite defendant's general request for exculpatory evidence prior to trial, he was not informed of Mrs. Bohmfalk's hypnosis nor provided with a transcript of the statements that she made while under hypnosis. It was stipulated that the prosecutors were not aware of the hypnotic sessions prior to trial. At trial, Mrs. Bohmfalk gave essentially the same description of her attacker as she had provided police with from her hospital bed including that he wore a green scrub shirt and a blue coat. Additionally, during trial, defendant attempted to show that Mrs. Bohmfalk's description of her attacker did not accurately depict him. He elicited testimony indicating that at the time of the offenses he was in his twenties, and he attempted to show that during the same time he wore his hair in curls.
The United States Supreme Court held in Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), that upon request the state must produce evidence that is favorable to the accused where it is material to guilt or punishment. The Brady rule has been expanded to include evidence which impeaches the testimony of a witness where the reliability or credibility of that witness may be determinative of guilt or innocence. A finding of materiality of the evidence is required under Brady. Giglio v. United States, 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972); State v. Smith, 437 So.2d 252 (La. 1983). When a general request for Brady material has been made, the failure of the state to disclose exculpatory evidence will not result in reversal of a conviction unless such evidence creates a reasonable doubt as to defendant's guilt that did not otherwise exist. Only then can defendant complain that nondisclosure deprived him of his due process right to a fair trial. United States v. Agurs, 427 U.S. 97, 96 S.Ct. 2393, 49 L.Ed.2d 342 (1976); State v. Curtis, 384 So.2d 396 (La.1980). As stated by the Court in Agurs:
The proper standard of materiality must reflect our overriding concern with the justice of the finding of guilt. Such a finding is permissible only if supported by evidence establishing guilt beyond a reasonable doubt. It necessarily follows that if the omitted evidence creates a reasonable doubt that did not otherwise exist, constitutional error has been committed. This means that the omission *1150 must be evaluated in the context of the entire record. If there is no reasonable doubt about guilt whether or not the additional evidence is considered, there is no justification for a new trial. On the other hand, if the verdict is already of questionable validity, additional evidence of relatively minor importance might be sufficient to create a reasonable doubt.
In the instant case, the transcript of the hypnotic session contains no evidence favorable to defendant except statements by Mrs. Bohmfalk where she described her attacker as wearing a brown flight jacket and hat. Since this information is contrary to the description she originally gave the police as well as her trial testimony that described her attacker's jacket as blue and made no mention of a hat, defendant could have used this evidence to attempt to impeach the credibility of Mrs. Bohmfalk's identifications. To that extent it would have been exculpatory. However, this impeachment testimony was not sufficient to create a reasonable doubt as to defendant's guilt that did not otherwise exist. Mrs. Bohmfalk identified defendant's photograph the first time that it was included in a photographic lineup. Additionally, she made a positive identification of defendant as the man who attacked her both at the physical lineup and at trial. Circumstantial evidence independent of Mrs. Bohmfalk's identifications also links defendant to the murder of Dr. Bohmfalk. The gun used to kill Dr. Bohmfalk was shown to have been in defendant's possession about five months before and five months after the murder. Defendant was seen with Dr. Bohmfalk on the morning of his death by a bartender who was warned by defendant to forget that he ever saw the doctor. A review of the record as a whole indicates that there is no reasonable doubt about defendant's guilt whether or not this additional evidence is considered. Hence, this contention is without merit.
This court has rejected a per se exclusion of testimony based on the fact of hypnosis alone. State v. Wren, 425 So.2d 756 (La.1983). See also State v. Goutro, 444 So.2d 615 (La.1984). In the instant case, there is no indication that the hypnotic session improperly enhanced Mrs. Bohmfalk's identifications of defendant. Defendant did not become a suspect in the case until about six months after Mrs. Bohmfalk underwent hypnosis. The transcript and tape of her December 28, 1979 hypnotic session show no indication that any attempt had been made to suggest a particular person to her. All of the witnesses who testified at the hearing on defendant's motion for a new trial gave no indication that the hypnotic session was in any way suggestive of defendant. Moreover, Dr. Jay W. Seastrunk, an expert in the field of psychiatry with a substantial amount of training in hypnosis, reviewed the hypnotic session conducted by Lieutenant Gorman and testified that no attempt had been made to suggest to Mrs. Bohmfalk that a particular individual should be identified. It was also his opinion that the session had in no way altered her ability to identify her attacker. Hence, we reject defendant's contention that Mrs. Bohmfalk's identifications of him were improperly enhanced by the hypnotic session.
Accordingly, the trial judge did not err in denying the motion for a new trial. Assignments of Error Nos. 14, 15, 16 and 17 are without merit.

DECREE
For the reasons assigned, defendant's convictions and sentences are affirmed.
DIXON, C.J., concurs, disagreeing with the treatment of Assignments 5 and 6.
DENNIS, J., concurs in the result with respect to the second degree murder conviction and dissents from affirming the aggravated battery conviction and sentence. See State ex rel. Elaire v. Blackburn, supra.
LEMMON, J., dissents and will assign reasons.
CALOGERO, J., dissents for reasons assigned by LEMMON, J.
NOTES
[1] Ten of these assignments of error do not represent reversible error nor do they involve legal issues not governed by clearly established principles of law. They will be treated in an appendix which will not be published but which will comprise a part of the record in this case.
[2] Other contentions raised in his motion for a new trial are either covered in subsequent assignments of error or are without merit.
[3] Mrs. Bohmfalk testified that Dr. Bohmfalk owned a Presidential Rolex watch with a gold nugget band, a diamond wedding ring, and three gold necklaces.