Jan J. PORRETTO, Plaintiff-Appellant,

v.

Richard STALDER, Warden, Wade Correctional Center, and William J. Guste, Jr., Attorney General of the State of Louisiana, Defendants-Appellees.

No. 87-3107.

United States Court of Appeals,
Fifth Circuit.

Dec. 21, 1987.

Ralph S. Whalen, Jr., Oestreicher, Whalen & Hackett, New Orleans, La., for plaintiff-appellant.

John J. Molaison, Jr., Dorothy A. Pendergast, Asst. Dist. Atty., Research & Appeals, Gretna, La., for defendants-appellees.

Before WISDOM, GARWOOD, and JONES, Circuit Judges:

EDITH H. JONES, Circuit Judge:

Plaintiff-appellant Jan Porretto, a state prisoner convicted of second degree murder and aggravated battery, appeals the district court's denial of his petition for a writ of habeas corpus. We AFFIRM.

## I.

On September 13, 1979, Joan Bohmfalk attended a midnight show with her daughter and son-in-law. She returned to her home around 3:00 a.m. and found her husband, Dr. Arthur Bohmfalk, and her son's car gone. A man posing as a coroner came to her home at 5:00 a.m. to tell Mrs. Bohmfalk that her husband had committed suicide. When Mrs. Bohmfalk went upstairs to call her daughter, the man severely struck her several times on the head and face, causing her to lose consciousness.

Dr. Bohmfalk's body was found in a local parking lot around 7:30 a.m. He had died from a single gunshot wound in the head. No identification or gun was found at the scene. Dr. Bohmfalk was still wearing two necklaces but his gold Rolex watch and diamond wedding ring had been taken. Police found the son's car the next day.

After examining several photographic line-ups and a physical line-up, Mrs. Bohmfalk identified Porretto as the man who had

attacked her.[1] Evidence at the trial showed that the bullet taken from Dr. Bohmfalk's skull had been fired from a gun owned by Porretto's father to which Porretto had access. A jury deadlocked at eight to four refused to convict Porretto of first degree murder and the court declared a mistrial.

At Porretto's second trial, John Senac, a bartender, came forward after becoming "born again." He testified that on the morning in question, he had introduced Dr. Bohmfalk and Porretto to each other, that the two men took turns buying drinks for each other, and that the two men left the bar around 3:00 a.m. together. Senac also testified that prior to leaving the bar Porretto told Senac to forget that he had seen Dr. Bohmfalk.

The second jury convicted Porretto of second degree murder and aggravated battery. He was sentenced to life imprisonment at hard labor without benefit of parole, probation, or suspension of sentence on the second degree murder conviction and was ordered to serve ten years and pay a fine of $5,000 on the aggravated battery conviction. The Louisiana Supreme Court affirmed the convictions and sentences. *State v. Porretto*, 468 So.2d 1142 (La.1985). The federal district court denied Porretto's petition for a writ of habeas corpus under 28 U.S.C. § 2254. Porretto has appealed and raises four issues.

## II.

Although defense counsel made a timely *Brady* request,[2] the State did not disclose until after the second trial that Mrs. Bohmfalk had been hypnotized twice prior to identifying Porretto.[3] Porretto argues that the State's inaction denied him a fair trial because it prevented him from offering testimony that hypnosis may have affected Mrs. Bohmfalk's ability to identify her true assailant. The state court held a hearing on Porretto's claim and declined to grant his motion for new trial.

Bohmfalk first described her assailant to Detective Hidding from her hospital bed one or two days after the attack. Hidding testified that Bohmfalk described her attacker as wearing a blue blazer over a green surgical gown, being 45–50 years old, 150–170 pounds, 5'6"–5'8", and having black short choppy hair combed to the side that did not want to lay down. Bohmfalk recounted a similar original description at trial. Bohmfalk subsequently helped the police and a personal friend create composite drawings of her assailant, but neither drawing proved useful. Nor could Bohmfalk identify her attacker from numerous photographic line-ups.

On December 28, 1979, Lieutenant Gorman hypnotized Bohmfalk. Under hypnosis, Bohmfalk described her assailant as wearing a blue suit coat over a green scrub shirt with pants that did not match the suit coat. She could not describe the man's face but said he was 35–40 years old and combed his hair straight to one side. She could also envision him wearing a leather or vinyl flight jacket and hat.[4]

Not until the police received an anonymous letter incriminating Porretto in early July 1980 did Porretto become a suspect. On July 7, Hidding included Porretto's picture in a photographic line-up. After viewing the pictures, Bohmfalk wrote on the back of Porretto's photo, "This appears very similar to the man who attacked me." Thereafter, Bohmfalk saw Porretto's photograph in a local newspaper, and on July 15 Bohmfalk identifed Porretto as her assailant at a physical line-up during which

---

**1.** Additional facts surrounding identification are presented in Part II, *infra*.

**2.** *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).

**3.** Apparently, the lack of communication occurred not between defense counsel and the district attorney, but between the district attorney and the police. Sergeant Hidding, who was in charge of the investigation, testified that he did not mention the hypnotic sessions in his report to the district attorney because he deemed such evidence irrelevant.

**4.** A second hypnotic session conducted by her personal physician in January 1980 was terminated almost immediately after its commencement when Bohmfalk became hysterical.

she became visibly shaken when Porretto appeared.

■ In *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), the United States Supreme Court held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or punishment, irrespective of the good faith or bad faith of the prosecution." *Id.* at 87, 83 S.Ct. at 1196–97, 10 L.Ed.2d at 218. Only when omitted evidence is deemed material can a defendant successfully claim that nondisclosure deprived him of his constitutional right to a fair trial. *United States v. Agurs*, 427 U.S. 97, 108, 96 S.Ct. 2392, 2400, 49 L.Ed.2d 342, 352 (1976). Omitted evidence is deemed material when, viewed in the context of the entire record, it creates a reasonable doubt as to the defendant's guilt that did not otherwise exist. *Id.* at 112, 96 S.Ct. at 2402, 49 L.Ed.2d at 355. The *Brady* rule has been expanded to include evidence which impeaches the testimony of a witness where the reliability or credibility of that witness may be determinative of guilt or innocence. *Giglio v. United States*, 405 U.S. 150, 154, 92 S.Ct. 763, 766, 31 L.Ed.2d 104 (1972).

Petitioner contends here that the fact of hypnosis, rather than the information elicited from Bohmfalk while she was hypnotized,[5] constituted material, exculpatory evidence under *Brady*. Armed with knowledge of the hypnosis, appellant asserts he could have cross-examined Bohmfalk about its effect on her recollection and that he could have offered expert testimony concerning the tendency of hypnosis to stimulate exaggerated or erroneous recall.

■ Two fatal flaws burden this argument. First, appellant had an opportunity at the state court hearing on motion for new trial, which was called to assess this *Brady* issue, to demonstrate the probity of his theories concerning hypnotic memory enhancement. He failed to do so. The state court relied upon the testimony of Dr. Seastrunk, a psychiatrist with significant training in hypnosis, for its conclusion that the hypnotic session neither prompted Bohmfalk to identify any particular individual nor altered Bohmfalk's ability to identify her assailant. *State v. Porretto*, 468 So.2d 1142, 1150 (La.1985). We, as a federal habeas corpus court, must render a presumption of correctness to this factual finding reached by the state court after a full and fair hearing on the merits. 28 U.S.C. § 2254(d).

■ The more basic flaw in appellant's logic is that his *Brady* argument attacks only one facet of the proof against him. Questions raised by the fact of Bohmfalk's hypnosis bear only on the reliability of her identification of Porretto. As note 5, *supra*, indicates, however this reliability had been otherwise exhaustively and competently explored by defense counsel. *Brady* requires that materiality be determined in light of all the evidence at trial, not just that portion sought to be introduced by the defendant. This evidence included the murder weapon shown to have been accessible to Porretto both before and after the killing, the bartender's eyewitness connection of Porretto and Dr. Bohmfalk, and Porretto's ominous admonition to Senac as Porretto left the bar with the doctor that Senac should forget he ever saw Dr. Bohmfalk. It is rank speculation to conclude, as appellant would urge, that compared with the incriminating evidence, any marginally more impeaching evidence concerning Bohmfalk's hypnosis could have created in the jurors' minds a reasonable doubt as to

---

**5.** In the state court and the district court, appellant also apparently contended that the discrepancies between Bohmfalk's descriptions of her attacker before, during and after hypnosis rendered the hypnotized description material for impeachment purposes. This contention was prudently abandoned, because so many different discrepancies in Bohmfalk's prior descriptions and identification had already been introduced to the jury—regarding Porretto's age (20's or 50's), the appearance of his hair (curly or straight), and the clothes worn by the attacker, that yet another source of inconsistency is not compellingly exculpatory. The defense also introduced testimony by a psychology professor expert in human perception, memory and eyewitness testimony that stress, violence, and head trauma, as well as viewing a photograph prior to a physical line-up, can affect an individual's memory.

Porretto's guilt. We do not find evidence of the fact of hypnosis material in this case, and consequently no *Brady* violation resulted from the prosecution's failure to divulge that evidence before trial.

## III.

Porretto next argues that the trial court violated his constitutional rights by refusing to allow the jury to hear part of Paul Clark's testimony and all of Don Larroque's testimony. He contends that the excluded testimony could have been used to impeach Senac's testimony and tended to show that Senac or Clark could have killed Dr. Bohmfalk and attacked Mrs. Bohmfalk.

The jury heard Senac admit living with Clark at one time but twice deny being a homosexual. Further, Clark testified that he was a jeweler, that he had lived with Senac for a year, and that he had not seen Senac for four years. Defense counsel attempted to impeach Senac's testimony by offering proof that Senac and Clark had a homosexual relationship. Outside the presence of the jury, Larroque testified that he knew both Senac and Clark, that Clark had told him that he and Senac were lovers, and that he had seen Clark and Senac in bed together once. He admitted, however, that he did not know for a fact that Senac was homosexual, that Senac had never told him that he and Clark were lovers, and that he had never seen Clark and Senac engage in homosexual activity. Clark testified outside the presence of the jury that he had shared a bedroom with Senac but denied that he and Senac were lovers or that they had ever engaged in homosexual activity.

The trial court prohibited Larroque and Clark from testifying about any alleged homosexual relationship between Clark and Senac because it deemed such testimony irrelevant and collateral. The Louisiana Supreme Court believed that although such evidence was arguably relevant, its probative value was "so outweighed by the danger of unfair prejudice, confusion of the issues to be determined, and undue delay that it was properly excluded." 468 So.2d at 1148.

■ We will grant federal habeas relief if an evidentiary error in a state trial "is of such magnitude as to constitute a denial of fundamental fairness under the due process clause." *Skillern v. Estelle,* 720 F.2d 839, 852 (5th Cir.1983), *reh'g denied,* 724 F.2d 127, *cert. denied,* 469 U.S. 873, 105 S.Ct. 224, 83 L.Ed.2d 153, *reh'g denied,* 469 U.S. 1067, 105 S.Ct. 551, 83 L.Ed.2d 438 (1984); *see also Dillard v. Blackburn,* 780 F.2d 509, 513 (5th Cir.1986). Erroneous exclusion of evidence is fundamentally unfair if the evidence was material in the sense that it was crucial, critical, and highly significant. *Skillern,* 720 F.2d at 852.

■ Exclusion of the testimony concerning Senac's alleged homosexual relationship with Clark did not render Porretto's trial fundamentally unfair. The jury knew that Senac had once lived with Clark, that Clark was a jeweler, and that Clark resembled the figure in one of the composite drawings. The possibility that the jury would infer that Senac and Clark were the culprits does not vanish in the absence of additional innuendo concerning Senac's sexual proclivity. Porretto's second argument is meritless.

## IV.

■ During the second trial, two of Porretto's brothers testified that the murder weapon was owned by their father and that they, as well as Porretto, had access to it during the time relevant to this case. The State, over defense counsel's objection, then read to the jury a transcript of Porretto's bail hearing during which the following colloquy took place:

"Question: From the time April 29, 1979, in New Orleans until the time you put the gun under Mr. Brent's front seat, did you have possession of the weapon?
Answer: Yes sir.
Question: No one else did?
Answer: Uh, my family.
Question: Who in your family had possession of it?
Answer: My father and my three brothers.

\*　　\*　　\*　　\*　　\*　　\*

Question: Would you have had possession of that weapon at that point in time [September 14 or 15, 1979]?

Answer: I would imagine I would have. Yes sir."

Trial Transcript at 376–78. Porretto first alleges that he was compelled to forfeit his Fifth Amendment right to remain silent in order to safeguard his Eighth Amendment right to bail. He then contends that the trial court improperly admitted into evidence the transcript of his bail testimony.

In *Simmons v. United States*, 390 U.S. 377, 394, 88 S.Ct. 967, 976, 19 L.Ed.2d 1247, 1259 (1968), the Supreme Court held: "[W]hen a defendant testifies in support of a motion to suppress evidence on Fourth Amendment grounds, his testimony may not thereafter be admitted against him at trial on the issue of guilt unless he makes no objection." In *United States v. Dohm*, 618 F.2d 1169 (5th Cir.1980), a plurality of this circuit distinguished testimony given at a bail hearing. The plurality noted that a defendant at a suppression hearing "must [give testimony that] necessarily go[es] to the ultimate facts and issues," *id.* at 1173, whereas "[a] defendant at a bail bond hearing need not divulge the facts in his case in order to receive the benefits of the eighth amendment right to bail," *id.* at 1174. The plurality then held that bail testimony voluntarily given by the defendant is admissible against him at trial. *Id* at 1175.

Porretto argues that the Louisiana bail statutes "compelled" him to waive his right against self-incrimination in order to pursue his right to bail. He relies on La.C. Crim.Pro. art. 313, which provides:

A person charged with the commission of a capital offense shall not be admitted to bail if the proof is evident and the presumption great that he is guilty of the capital offense.

When a person charged with the commission of a capital offense makes an application for admission to bail, the judge shall hold a hearing contradictorily with the state. The burden of proof:

\* \* \* \* \* \*

(2) After indictment is on the defendant to show that the proof is not evident or the presumption is not great that he is guilty of the capital offense.

We fail to see how this statute "compels" a defendant to waive his Fifth Amendment right or forego his Eighth Amendment right. The statute may have placed the burden of proof on Porretto, but it did not require him to personally testify in order to satisfy his burden. Nor, absent the statutory scheme, do we find that Porretto testified involuntarily, for unlike the defendant in *Dohm*, Porretto was represented by counsel at his bail hearing. Additionally, Porretto's counsel, not the prosecuting attorney called Porretto to the witness stand at the bail hearing.

■ Even if we were to conclude that Porretto's bail testimony was compelled and involuntary and that the trial court erred in admitting his bail testimony at trial, we would not reverse and remand, for any such error is harmless beyond a reasonable doubt. *See Delaware v. Van Arsdall*, 475 U.S. 673, 106 S.Ct. 1431, 1436–37, 89 L.Ed.2d 674 (1986); *Chapman v. California*, 386 U.S. 18, 21–24, 87 S.Ct. 824, 827–28, 17 L.Ed.2d 705 (1967). Porretto's brothers testified that adult family members had access to the murder weapon. Read in context, as defense counsel admits, nothing in Porretto's testimony contradicted what his brothers had already said.[6] Furthermore, evidence of Porretto's guilt was overwhelming. *See* Section V, *infra*. We thus hold that any error in admitting Porretto's bail testimony was harmless beyond a reasonable doubt.[7]

6. *See* Appellant's Brief at 25 (Brothers' testimony was "completely consistent with Porretto's bail hearing testimony."), and 26 (Porretto's bail testimony "does not rebut or contradict in any way" his brothers' testimony.).

7. Defense counsel suggests that Porretto's response to the last question quoted could have caused substantial prejudice because the jury might interpret "possession" as "physical dominion" rather than "access." If we were to agree with defense counsel that such an interpretation of Porretto's bail testimony is plausible, we would still not reverse and remand. Rather, we would then conclude that the trial court properly admitted the testimony to impeach the testi-

## V.

Porretto's final argument is that the evidence is insufficient to support his conviction. The standard for testing the sufficiency of evidence in a federal habeas review of a state court conviction is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Selvage v. Lynaugh*, 823 F.2d 845, 847 (5th Cir.1987) (citing *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979)). In Porretto's state court appeal, the Louisiana Supreme Court reviewed the evidence and determined that a rational trier of fact could conclude beyond a reasonable doubt that Porretto specifically intended to kill Dr. Bohmfalk and that he attempted to kill Mrs. Bohmfalk. 468 So.2d at 1146–47. The state court's determination is entitled to great weight in a federal habeas review. *Wingo v. Blackburn*, 786 F.2d 654, 655 (5th Cir.1986), *cert. denied*, —— U.S. ——, 107 S.Ct. 1984, 95 L.Ed.2d 823 (1987). We have reviewed the record and believe that it supports the Louisiana Supreme Court's finding.

## VI.

Having concluded that Porretto's arguments are meritless, we AFFIRM the judgment of the district court.

---

mony of Porretto's brothers, who testified that they had access to the gun during this time. *See United States v. Charles*, 738 F.2d 686, 697 (5th Cir.1984) (Testimony from suppression hearing can be used at trial for purposes of impeachment.); *United States v. Gomez–Diaz*, 712 F.2d 949, 951 n. 1 (5th Cir.1983), *reh'g denied*, 717 F.2d 1399, *cert. denied*, 464 U.S. 1051, 104 S.Ct. 731, 79 L.Ed.2d 191 (1984) ("A defendant at a suppression hearing may testify without fear that that testimony will be used against him at trial except for impeachment. *Simmons v. United States*, 390 U.S. 377, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968).").