927 F.2d 605
 Unpublished Disposition
NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
UNITED STATES of America, Plaintiff-Appellee,
v.
Russell Cox DEAN, Defendant-Appellant.
 No. 90-1420.
 United States Court of Appeals, Sixth Circuit.
 March 7, 1991.
 
 On Appeal from the United States District Court for the Western District of Michigan, No. 89-00134; Benjamin F. Gibson, C.J.
 W.D.Mich.
 AFFIRMED.
 Before RALPH B. GUY, Jr. and BOGGS, Circuit Judges, and LIVELY, Senior Circuit Judge.
 PER CURIAM.
 
 
 1
 Defendant, Russell Dean, appeals from his conviction for the offense of tampering with a witness. 18 U.S.C. Sec. 1512(b)(1).[1] Dean's primary argument on appeal is that prejudicial error requiring reversal occurred at his trial when the government was allowed to reference testimony previously given by Dean at a pretrial detention hearing.
 
 
 2
 Upon a review of the record, we conclude that although the admission of the testimony in question was arguably error, the error was harmless beyond a reasonable doubt. Accordingly, we affirm.
 
 I.
 
 3
 Dean was indicted in May 1988 and charged with four counts of heroin distribution and four counts of using a telephone to facilitate the heroin distribution. Although the government sought pretrial detention, Dean was released on bond. One of the conditions of his release was that he not have any contact with potential government witnesses.
 
 
 4
 The key witness for the government in Dean's trial was to be William Carthen. Carthen, a felon, was a former heroin addict and drug dealer who became an undercover cooperating informant for the FBI. In return for Carthen's cooperation, a variety of pending charges against him were dropped. The FBI used Carthen to make drug purchases while wearing a body recorder. Carthen had made purchases from Dean which were recorded.
 
 
 5
 As part of pretrial discovery, defendant and his counsel were furnished with transcripts of taped conversations and ultimately with copies of the tapes themselves. In the transcripts, references to undercover informants or agents were obscured, but one of the transcripts furnished to Dean failed to "white-out" the name "William." These transcripts were available to defendant as early as August 10, 1989, but it is not clear that defendant deduced at that time that Carthen, whom he had known for 20 years, was an informant. On September 15, 1989, and again on September 18, 1989, Dean and his attorney appeared at the FBI office in Lansing, Michigan, for the purpose of providing a voice exemplar to be used for comparison with the undercover tapes. At these sessions, Dean not only had access to the transcripts but also read from the transcripts for the purpose of the voice exemplar. Three days later, on September 21, 1989, a pretrial conference was held at which Dean was present. Trial was set for October 3, 1989.
 
 
 6
 On the afternoon of September 21, 1989, after the pretrial, Carthen was walking down the street in Lansing when Dean pulled up in a car and called to him. What occurred next is succinctly summarized in Judge Gibson's opinion, which issued after the hearing on the detention motion:
 
 
 7
 Defendant told Carthen that he just came from court in Grand Rapids and that he was scheduled to go back to court on October 3. He told Carthen that he had recently heard some undercover tapes (or had read the transcripts) and learned from that source that Carthen was the government informant against him. He told Carthen that if Carthen testified against him, defendant would "get life." Defendant said that all the other witnesses against him were police officers. Defendant said, "Before I do life, I'll see you getting life in hell."
 
 
 8
 According to Carthen, defendant then alluded to the fact that Carthen had been in jail until very recently, because Carthen could not afford to make bail. Defendant said that "they" [presumably persons acting in concert with defendant] got Carthen out of jail on bond to make sure that he would not be available to the FBI for testimony at the October 3 trial. Defendant said that if Carthen testified in court, he would not live twenty-four hours. Defendant also told Carthen that there was a contract out on Carthen's life but that defendant would try to take care of it if Carthen stayed out of sight. Defendant offered to get Carthen some money to get out of town.
 
 
 9
 According to Carthen, defendant then said, "You're too young to come up like Ira and Joe." The reference to "Ira" was to Ira Street, a government witness who was killed shortly before he was scheduled to testify.
 
 
 10
 According to Carthen, defendant then said, if "this [the meeting between defendant and Carthen] gets back to the FBI, they'll pick me up," because defendant had been ordered not to talk to any government witness. Then, Carthen testified, defendant pulled up Carthen's shirt to check for a concealed recorder.
 
 
 11
 Carthen testified that he did not argue with defendant and that he promised to stay off the streets until defendant got back to him. Instead, as soon as the men parted, Carthen telephoned Agent Langkos of the FBI. Langkos was unavailable, and Carthen left a message. Carthen and Langkos then met at about five o'clock that evening.
 
 
 12
 (App. at 41-43).
 
 
 13
 As a result of this encounter, Dean was indicted on September 26, 1989, and charged with witness tampering. The government then moved to have defendant's bail revoked in the heroin case and for a pretrial detention order in the tampering case. At the ensuing hearing, Dean testified, and during his cross-examination the following exchange took place:
 
 
 14
 Q And you received the transcripts from your attorney sometime in August?
 
 
 15
 A I believe so.
 
 
 16
 Q And you were--you read those through?
 
 
 17
 A Transcripts?
 
 
 18
 Q Yes.
 
 
 19
 A Well, I looked at them. I read them. I did.
 
 
 20
 Q In fact, you went and showed them to other people; didn't you?
 
 
 21
 A No, I showed them to my cousin because his name was on there.
 
 
 22
 Q All right. But you showed them to at least one other person?
 
 
 23
 A My cousin.
 
 
 24
 Q That's Mr. Wilson?
 
 
 25
 A Mr. Wilson.
 
 
 26
 Q So you were familiar with what was in those transcripts, right?
 
 
 27
 A Familiar with them?
 
 
 28
 Q Yes.
 
 
 29
 A I mean, I read them. Yes, I read them.
 
 
 30
 (App. at 56). At the conclusion of the hearing, a detention order issued.
 
 
 31
 At trial, Dean's defense was structured around trying to suggest that the FBI was interested in prosecuting another drug dealer, Percy Edmond, whom Dean knew, and that the tampering charge was fabricated to try to put pressure on Dean to cooperate with the government. As part of this defense, Dean maintained that on September 21, 1989, when he was with Carthen, he did not know that Carthen was the informant. Thus, the date on which Dean first had access to the materials from which he could have gleaned Carthen's status as an informant became relevant.
 
 
 32
 When FBI Agent Langkos testified, he told of the September voice exemplar sessions at which Dean had access to the transcripts. Since these sessions were prior to the alleged date of the witness tampering, the government apparently did not think it necessary to bring out the fact that Dean had these transcripts as early as August 10, 1989. However, on cross-examination, defense counsel attempted to dilute the impact of the testimony relative to the voice exemplar sessions. As a result, on re-direct examination, Agent Langkos was allowed to testify to the fact that Dean earlier had testified that he had received and read the transcript copies on August 10, 1989.
 
 
 33
 Dean argues that the reference to his detention hearing testimony[2] violated his fifth amendment rights against self-incrimination. In support of this argument, he relies primarily on the decision in United States v. Perry, 788 F.2d 100 (3rd Cir.), cert. denied, 479 U.S. 864 (1986). Perry involved an appeal by the government from an order denying pretrial detention without bail. Perry argued that the rebuttable presumption provision of 18 U.S.C. Sec. 3142(e) had the effect of requiring a defendant to testify at a detention hearing and was thus unconstitutional since it violated the privilege against self-incrimination.[3] Although the court rejected this argument, it did so by relying in part upon the fact that a court could protect a defendant by granting use-fruits immunity. In the case at bar, no immunity was offered. Although Perry considers the self-incrimination issue in a context different from what we have here, its reasoning is nonetheless applicable. The government attempts not so much to distinguish Perry as it does to point to other cases that it claims reach a contrary result. The government's cited cases, however, are themselves distinguishable. Some of them predate the provisions of the Bail Reform Act at issue here, while others, such as UnitedStates v. Ingraham, 832 F.2d 229 (1st Cir.1987), cert. denied, 486 U.S. 1009 (1988), do not involve the rebuttable presumption provisions of section 3142(e). However, we do find the case of Poretto v. Stalder, 834 F.2d 461 (5th Cir.1987), to be helpful in its reasoning. Porretto was a habeas case and so is factually different in that regard. It is analogous, however, in its discussion of the issue of a defendant testifying at a bail hearing:
 
 
 34
 The statute may have placed the burden of proof on Porretto, but it did not require him to personally testify in order to satisfy his burden. Nor, absent the statutory scheme, do we find that Porretto testified involuntarily, for unlike the defendant in [United States v.] Dohm, [618 F.2d 1169 (5th Cir.1980) ], Porretto was represented by counsel at his bail hearing. Additionally, Porretto's counsel, not the prosecuting attorney called Porretto to the witness stand at the bail hearing.
 
 
 35
 Id. at 466.
 
 
 36
 Although we agree generally with the observations of the Poretto court, we note that the court also found that the admission of the bail hearing testimony at trial, if error, was harmless beyond a reasonable doubt. We reach a similar conclusion relative to the admission of Dean's bail hearing testimony using the harmless error standard of Chapman v. California, 386 U.S. 18 (1967). The jury had more than ample testimony before it from which they could have concluded that Dean learned of the identity of Carthen at the voice exemplar sessions. Furthermore, the meeting between Carthen and Dean is not disputed, only the tenor of the conversation that was held between them. If the jury chose to credit Carthen, which it obviously did, his testimony supplied all the evidence necessary to convict Dean of witness tampering. The issue is what Dean said to Carthen, not how Dean learned Carthen was going to testify against him. In addition, the trial judge, at the request of the defendant, gave the jury a cautionary instruction that told them "to disregard the testimony of Agent Langkos regarding this matter...." (App. at 190).
 
 II.
 
 37
 Dean also argues that he was deprived of his fifth amendment right against self-incrimination at the detention hearing because the magistrate did not specifically warn him of the possible consequences. There are several problems with this argument. First, since we have concluded that any error in admitting his bail testimony at trial was harmless, this issue is now moot. Second, Dean was advised of his rights on more than one occasion, and he had counsel at the bail hearing. It was his own counsel who called him to testify. At the first detention hearing, Dean elected not to testify, so he knew the choice was his. Although a court is required to tell a defendant that he need not testify, we know of no rule requiring the judicial officer to intercede when a defendant, represented by counsel, elects to testify.
 
 III.
 
 38
 Defendant's final argument is that a motion for a mistrial should have been granted as a result of linking the defendant to an unsavory character named Percy Edmond. Defendant conveniently overlooks the fact that it was his counsel who interjected Edmond into the testimony. It was part of the defense strategy to try to create the impression that the FBI was interested primarily in Edmond and wanted to "squeeze" Dean to secure his cooperation in gathering evidence against Edmond. It was defense counsel who, in questioning Agent Langkos, characterized Edmond as "unsavory" and who also alluded to the fact that Edmond was driving by Carthen's house after the meeting between Dean and Carthen.[4] On re-direct examination, Agent Langkos was asked to answer the question as to whether Dean and Edmond were associates. Defense counsel objected, however, and, in the argument that followed, the question was never actually answered. Even if it were answered or if it could be said the jury could have inferred what the answer would be, we find the question was an appropriate one, given the questions that were asked about Edmond by defense counsel.
 
 
 39
 AFFIRMED.
 
 
 
 [1]
 18 U.S.C. Sec. 1512(b)(1) reads:
 (b) Whoever knowingly uses intimidation or physical force, threatens, or corruptly persuades another person, or attempts to do so, or engages in misleading conduct toward another person, with intent to--
 (1) influence, delay, or prevent the testimony of any person in an official proceeding;
 * * *
 shall be fined not more than $250,000 or imprisoned not more than ten years, or both.
 
 
 [2]
 The jury was not made aware of the fact that the earlier testimony was given at a detention hearing
 
 
 [3]
 18 U.S.C. Sec. 3142(e) provides:
 (e) Detention.--If, after a hearing pursuant to the provisions of subsection (f) of this section, the judicial officer finds that no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community, such judicial officer shall order the detention of the person before trial. In a case described in subsection (f)(1) of this section, a rebuttable presumption arises that no condition or combination of conditions will reasonably assure the safety of any other person and the community....
 
 
 [4]
 There was testimony that after Dean threatened Carthen suspicious activity started to occur near Carthen's house, e.g., cars going by slowly