LOBRANO, Judge.
Defendant, James Renney, was indicted by a grand jury for the second degree murder of Dianne Corleone, a violation of La.R.S. 14:30.1.
Defendant was arraigned on March 2, 1988 and pled not guilty. Defendant subsequently waived his right to trial by jury. Following a bench trial, defendant was found guilty of manslaughter. On October 6, 1988, defendant was sentenced to eighteen (18) years at hard labor with credit for time served.
FACTS:
On December 25, 1987, at approximately 4:00 a.m., the body of Dianne Corleone, a local prostitute, was found in a driveway in the 1300 block of St. Claude Avenue near Esplanade Avenue. The driveway belongs to the apartment building at 1206 Esplanade Avenue owned by the parents of defendant’s roommate, George “Jerry” McCann, Jr. Corleone had been stabbed twenty-five times. Her pants were unbuttoned and the pockets pulled out. Near the body were found a syringe and several scraps of paper. No one witnessed the murder.
McCann and defendant lived in one of the upstairs apartments at 1206 Esplanade Avenue. Defendant had moved in with McCann several days earlier.
McCann and defendant were home when the police arrived at the murder scene. Both were questioned by Detective Byron Adams. McCann told Adams that defendant arrived home at approximately 2:30 a.m. Both denied any knowledge of Corleone or the murder.
Ferguson Boniface, Jr., who lived in the 1400 block of St. Claude Avenue, walked to the murder scene. Upon viewing the body, he immediately identified the victim. He told Detective Norman Pierce that Cor *636 leone had been living with him for the past several days and that he believed Corleone was on her way back to his apartment when she was murdered. He further stated that on December 24th between 9:00 a.m. and 9:30 a.m., he saw Corleone in an alley on Ursuline Street with two men. One was black and wore a hat; the other was older, taller and white. Boniface believed the black man was Corleone’s boyfriend. Boniface followed the trio to an apartment. He knocked on the door. Another white male answered and told Boniface to leave. As he left, he asked several neighbors to keep an eye on Corleone fearing that she might be in trouble. At trial, Boniface testified that none of the men he saw was the defendant.
During the course of the investigation, Detective Pierce found out that a black male, described as short and ugly, named “Frankie” had been looking for Corleone on December 24th. Robert Lake, manager of the St. Ann Deli in the French Quarter, testified that a short “funky looking” black man came into the deli on Christmas Eve looking for Corleone. Lake stated the man appeared to be very angry with her. Michael O’Bannon, a male prostitute and friend of Corleone, testified that he saw “Frankie” on Christmas Eve on Rampart Street. He stated Frankie was upset and was looking for Corleone because she owed him money. O’Bannon described “Frankie” as black, tall with facial hair, wearing a baseball cap and carrying a knife in his pants.
In early January, Detective Pierce interviewed Jeffrey Leggett, a local cocaine dealer. Leggett distributed cocaine from the premises located at 1225 St. Philip Street. This location was known as the “Rock House”. Leggett admitted knowing Corleone. He told Pierce that he would try to find out what he could about her murder. Subsequently, on January 17th, McCann and his friend, Michael “Chelly” Burley, contacted Pierce and reported that defendant killed Corleone.
McCann told Pierce that he and defendant had been shooting cocaine on Christmas Eve until around midnight. Defendant then left and returned sometime after 3:00 a.m. Christmas morning. Defendant was accompanied by Corleone. Defendant and Corleone went into the bathroom where McCann believed they were having sex. About fifteen or twenty minutes later, both emerged from the bathroom and went into the kitchen. Defendant appeared hyper and agitated. He told McCann that he was going to walk Corleone home. Defendant and Corleone left. McCann went to sleep on a living room sofa. Approximately five to ten minutes later, McCann was awakened when defendant returned. Defendant went immediately to his bedroom and changed his clothes. Because it was dark, McCann did not notice any blood on defendant’s clothes. Defendant emerged from his bedroom, breathing heavily and sweating. He told McCann he had “jammed her twice”. McCann interpreted this to mean defendant had sex with Corleone. Within minutes of defendant’s return to the apartment, McCann heard screams from outside. He looked out and saw a black woman running down St. Claude and screaming. Shortly thereafter an ambulance and the police arrived in the driveway. McCann went downstairs to investigate and saw Corleone’s body. He testified that he was in shock and very frightened. When questioned by the police, both McCann and defendant denied knowing Corleone.
Approximately two hours after the police left, defendant told McCann he had killed Corleone for her drugs and money, but she had none on her. McCann asked defendant which knife he used. Defendant responded that it was the very knife that McCann was using to prepare a salad for a Christmas party later that day. Defendant then threatened McCann if he told anyone. Frightened, McCann told defendant he was going to the apartment of his friend Michael Burley to get a bigger salad bowl and some “joints”. Defendant insisted on accompanying him. McCann said nothing to Burley at that time. Later, McCann returned to Burley’s home telling defendant he was going to get another “joint”. Defendant did not accompany McCann. McCann told Burley defendant killed Cor *637 leone. At first Burley did not believe McCann but later returned with him to McCann’s apartment. There they discussed the murder with defendant and how to dispose of his bloody clothes. Defendant had tried to wash the blood stains out but was unsuccessful. Burley suggested the best place to dispose of the clothes was near a hospital where wounded and injured people often remove their bloody clothing. Burley then returned home. McCann and defendant wrapped the clothes in Christmas paper to disguise them. McCann then drove defendant around until he disposed of the clothes in a garbage container.
Several days before McCann went to the police, he smelled lysol in his drinking water and on the spoon he used to cook his cocaine for injection. Fearing for his life, he told Burley. Burley urged him to go to the police. Later, McCann discovered his VCR and television were missing and believed defendant had stolen them. McCann and Burley then went to Jeffrey Leggett to find out if defendant tried to fence the missing items. Leggett admitted defendant did try to exchange them for cocaine, but states he refused the offer. He told defendant to speak to “Al” who owned the “Rock House”. McCann and Burley then told Leggett that the defendant confessed to killing Corleone. Leggett encouraged them to inform Detective Pierce. On January 17th, McCann and Burley contacted Pierce. Leggett joined them a short time later. Leggett admitted to Pierce that he had seen defendant and Corleone together around midnight on Christmas Eve at the “Rock House”. Leggett stated defendant bought some cocaine and then left with Corleone. Leggett did not come forward sooner because he feared arrest for distribution of cocaine. He denied testifying for the prosecution in order to help his homosexual lover who was facing probation revocation in Plaquemines Parish on cocaine possession charges. Leggett admitted he was on probation for cocaine possession.
Irene “Blondie” LaFauce, a prostitute who frequented the “Rock House”, testified she first overheard defendant admit to “Al” that he killed Corleone. Later, defendant admitted to her that he murdered Corleone.
Defendant appeals his conviction and sentence asserting the following assignments of error:
1) The State failed to prove defendant was guilty of the killing of Dianne Corleone beyond a reasonable doubt.
2) The trial court applied an erroneous instruction on reasonable doubt, particularly when coupled with the instruction as to circumstantial evidence.
ASSIGNMENT OF ERROR 1:
Defendant asserts there was insufficient evidence to support his conviction. Specifically, he argues the State’s case was based on circumstantial evidence which did not exclude the possibility that “Frankie” killed Corleone. Furthermore, he asserts the prosecution witnesses were not credible in that each had a self-serving motive such as money, revenge or immunity from prosecution in testifying against him.
The standard for reviewing a claim of insufficient evidence is whether, after viewing the evidence in the light most favorable to the prosecution, a rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); State v. Fuller, 414 So.2d 306 (La.1982).
When the conviction is based on circumstantial evidence, such evidence must exclude every reasonable hypothesis of innocence. La.R.S. 15:438; State v. Camp, 446 So.2d 1207 (La.1984). This is not a stricter standard of review, but rather an evidentiary guide for the trier of fact when it considers circumstantial evidence. State v. Porretto, 468 So.2d 1142 (La.1985). If a rational trier of fact reasonably rejects the defendant’s hypothesis of innocence, that hypothesis fails. Unless another hypothesis creates reasonable doubt, the defendant is guilty. State v. Captville, 448 So.2d 676 (La.1984).
Nevertheless, the reviewing court may not disregard its duty to consider whether the evidence is constitutionally *638 sufficient simply because the record contains evidence that tends to support each fact necessary to constitute the crime. State v. Mussall, 523 So.2d 1305 (La.1988). The reviewing court is not permitted to consider just the evidence most favorable to the prosecution but must consider the record as a whole since that is what a rational trier of fact would do. Mussall, supra. If rational triers of fact could disagree as to the interpretation of the evidence, the rational trier’s view of all the evidence most favorable to the prosecution must be adopted. Mussall, supra. The fact finder’s discretion will be impinged upon only to the extent necessary to guarantee the fundamental protection of due process of law. Mussall, supra.
Defendant was convicted of manslaughter. Manslaughter is:
“(1) A homicide which would be murder under either Article 30 (first degree murder) or Article 30.1 (second degree murder), but the offense is committed in sudden passion or heat of blood immediately caused by provocation sufficient to deprive an average person of his self control and cool reflection. Provocation shall not reduce a homicide to manslaughter if the jury finds that the offender’s blood had actually cooled, or that an average person’s blood would have cooled, at the time the offense was committed; or
(2) A homicide committed, without any intent to cause death or great bodily harm.
(a) When the offender is engaged in the perpetration or attempted perpetration of any felony not enumerated in Articles 30 or 30.1, or of any intentional misdemean- or directly affecting the person; or
(b) When the offender is resisting lawful arrest by means, or in a manner, not inherently dangerous, and the circumstances are such that the killing would not be murder under Articles 30 or 30.1.”
“Heat of blood” and “sudden passion” are not elements of the crime but rather factors which serve to mitigate the grade of the offense from homicide to manslaughter. State v. Lombard, 486 So.2d 106 (La.1986); on remand, 501 So.2d 889 (La.App. 5th Cir.1987), writ den., 506 So.2d 504 (La.1987); State v. Silbey, 450 So.2d 710 (La.App. 4th Cir.1984).
In finding defendant guilty of manslaughter, the trial court stated:
“My decision is based solely on the evidence, and in particular I charged myself as I would charge a jury in a case. And, an important consideration in the case was some of the expert testimony given by the doctor in this case, in particular the type of wounds and the fashion which this took place. Also, the events through the mouths of the person that you lived with to the activity right prior to this event — that sexual encounter in that bathroom — taking that event and believing that event and believing that witness and taking the expert testimony of the doctor and his opinions as to this type of killing and also reflecting upon the testimony of the other witness, Michael Burley, and his testimony and although it was facinating, [sic] I did believe his testimony in this case and I believe what he said regarding this case, and I believe that there was an attempt to get rid of these garments. Sir, I have to find you guilty. I am not finding you guilty of second degree murder, because there are no eye witnesses to the event, but with taking the expert testimony and all of the events surrounding the cocaine, I feel that considering all of the proof and the degree of proof that I have in a criminal case that I must find you guilty of manslaughter.”
It is not the province of the reviewing court to assess the credibility of witnesses unless the trial court’s finding is clearly contrary to the evidence. State v. Cashen, 544 So.2d 1268 (La.App. 4th Cir.1989); State v. Turner, 499 So.2d 1282 (La.App. 4th Cir.1986).
It is clear from the record that the trial court found the testimony of the prosecution witnesses to be credible. While the prosecution witnesses are less than model citizens, we can find no rational basis to conclude the trial court’s assessment of their credibility clearly wrong.
*639 This assignment of error is without merit.
ASSIGNMENT OF ERROR 2:
Defendant asserts the trial judge erroneously charged himself using instructions on reasonable doubt recently found unconstitutional by the United States Supreme Court in Cage v. Louisiana, — U.S. -, 111 S.Ct. 328, 112 L.Ed.2d 339 (1990). Defendant argues that this erroneous charge coupled with his failure to state that he had considered the circumstantial evidence rule, constitutes reversible error.
We disagree.
When a case is tried by a judge, the proper method of preserving such an issue of law for appellate review is to request the judge to charge himself before the verdict as to the disputed issue and to object to it if it is incorrect. C.Cr.P. Arts. 781 and 841; State v. Strickland, 398 So.2d 1062 (La.1981). In the absence of such a procedure, the question of whether the trial judge decided defendant’s guilt on the basis of incorrect legal principles is not determinable. Strickland, supra; State v. Beeves, 342 So.2d 605 (La.1977).
Although the trial court stated he charged himself, defendant did not request that he do so nor did defendant request copies of the charges or object to any erroneous charges that may have been used. Defendant failed to follow the procedure set forth in C.Cr.P. Art. 781. Since the record is void of any reference to legal principles upon which the trial judge based his finding, we find no error.
ERRORS PATENT:
We have reviewed the record for errors patent and find none.
For the reasons assigned above, defendant’s conviction and sentence are affirmed.
AFFIRMED.