STATE OF LOUISIANA

COURT OF APPEAL, THIRD CIRCUIT

06-410

STATE OF LOUISIANA

VERSUS

LEROY WAGUESPACK

**********
APPEAL FROM THE
SIXTEENTH JUDICIAL DISTRICT COURT
PARISH OF IBERIA, NO. 04-1232
HONORABLE EDWARD LEONARD, JR., DISTRICT JUDGE
**********

GLENN B. GREMILLION
JUDGE

**********

Court composed of Sylvia R. Cooks, Michael G. Sullivan, and Glenn B. Gremillion, Judges.

AFFIRMED.

J. Phil Haney
District Attorney
300 Iberia Street, Suite 200
New Iberia, LA 70560
(337) 369-4420
Counsel for Plaintiff/Appellee:
    State of Louisiana

Jeffrey J. Trosclair
Asst. District Attorney
St. Mary Parish Courthouse
Franklin, LA 70538
(337) 828-4100, Ext. 550
Counsel for Plaintiff/Appellee:
    State of Louisiana

**Mark O. Foster**
**Louisiana Appellate Project**
**P. O. Box 2057**
**Natchitoches, LA 71457**
**Counsel for Defendant/Appellant:**
       **Leroy Waguespack**

GREMILLION, Judge.

In this case, the defendant, Leroy Waguespack, was convicted of aggravated rape, in violation of La.R.S. 14:42, and was sentenced to life imprisonment without the benefit of probation, parole, or suspension of sentence. Defendant now raises two assignment of errors contending that the evidence was insufficient to support his conviction and that his sentence is excessive. For the following reasons, we affirm.

## SUFFICIENCY OF EVIDENCE

In his first assignment of error, Defendant contends the evidence was insufficient to convict him of the charge of aggravated rape. Our standard of reviewing sufficiency of evidence is as follows:

> In reviewing the sufficiency of evidence, an appellate court must determine that the evidence, whether direct or circumstantial, or a mixture of both, viewed in the light most favorable to the prosecution, was sufficient to convince a rational trier-of-fact that all of the elements of the crime have been proven beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); *State v. Captville*, 448 So.2d 676, 678 (La.1984). Additionally, when circumstantial evidence forms the basis of the conviction, the evidence, "assuming every fact to be proved that the evidence tends to prove . . . must exclude every reasonable hypothesis of innocence." La.Rev.Stat. 15:438; *see State v. Jacobs*, 504 So.2d 817, 820 (La.1987)(all direct and circumstantial evidence must meet the *Jackson v. Virginia* test); *State v. Porretto*, 468 So.2d 1142, 1146 (La.1985) (La.Rev.Stat. 15:438 serves as an evidentiary guide for the jury when considering circumstantial evidence).

*State v. Sosa*, 05-0213, pp. 6-7 (La. 1/19/06), 921 So.2d 94, 99.

In order to support a conviction of aggravated rape, the State was required to prove beyond a reasonable doubt that Defendant had oral, vaginal, or anal sexual intercourse with a victim who was under thirteen years of age. La.R.S.

1

14:42(A)(4). "[A]ny sexual penetration, when the rape involves vaginal or anal intercourse, however slight, is sufficient to complete the crime." La.R.S. 14:41(B). In *State v. Ross*, 03-564, p. 11 (La.App. 3 Cir. 12/17/03), 861 So.2d 888, 895, *writ denied*, 04-0376 (La. 6/25/04), 876 So.2d 8290, we defined sexual penetration as, "[a]ny penetration, however slight, of the aperture of the female genitalia, even its external features, is sufficient."

_____ The record reflects that Dave Lamperez allowed Defendant, who was homeless, to move into his trailer with him two to three days prior to June 3, 2004, the date of the offense at issue. On that date, S.B. and her child, T.B., who was the victim in this case, went to Lamperez's residence at approximately midnight.[1] Lamperez and S.B. later left Lamperez's home and went to another trailer, two doors down, belonging to some people described as Mexicans.

Lamperez testified that when he returned to his trailer he found Defendant with T.B. At that time, Defendant was totally nude and kneeling in front of T.B. and T.B. had her shorts off. Lamperez further described what he saw as follows: "[T.B.] was like on her knees. Her pants was off, and she had her hands toward the back like she was leaning back, and [Defendant] was in front of her." He did not see any oral sex or vaginal or anal penetration. Lamperez ran to T.B.'s mother and reported the incident to her and Defendant ran from the trailer.

T.B. testified that she was born on May 2, 1996, making her eight years old at the time of the crime. She described Defendant as "the boy" who hurt her by putting "his private in her private." T.B. explained that she was watching Sponge

---

[1] The initials of the victim and her family members are being used in accordance with La.R.S. 46:1844(W).

2

Bob when Defendant took her off the sofa and took his clothes off, then took her clothes off. She said that he then got on top of her and he kept moving up and down. T.B. said that Lamperez subsequently came into the room and Defendant grabbed his clothes and left out of the back door. T.B.'s mother then took her to the hospital. When asked where her private part was, T.B. pointed to her vagina.

T.B. said that she told the doctor and her mother that the boy put his private in her mouth. At trial, T.B. acknowledged that this act did in fact occur. T.B. testified that she told Ann Lavergne, a forensic interviewer with Stuller Place, that Defendant put his private in her mouth. T.B. stated that if she told Lavergne that this did not occur, it was a lie. T.B. also testified that Defendant put lotion on his private and on her private and the lotion made her private burn.

Lavergne interviewed T.B. on June 10, 2004. During that interview, T.B. stated that Defendant put his private inside her private and he put lotion on his private and her private. She further stated that Defendant had sex with her. T.B. at first indicated that she did not know what sex meant, then she stated that sex meant getting on top of you. She later indicated that Defendant used the word "sex." T.B. also told Lavergne that the boy put two fingers inside her private. T.B. did not tell Lavergne that oral sex had occurred.

T.B. was taken to the emergency room on June 4, 2004. Mona Moore was working as a nurse in the emergency room at that time. Moore testified that T.B. was talkative, calm, and not in any acute distress while there. A questionnaire filled out by Moore indicated that T.B. was not sure that vaginal or anal penetration occurred. However, the questionnaire indicated that oral sex had occurred. Moore

3

indicated that the answers were based on information provided by T.B. A history of the assault was written on a "Sexual Assault Evidence Collection Kit Information Sheet." The sheet was introduced as Defendant's Exhibit 1 and indicated that T.B. stated that a thirty-three-year-old "had sex with her."

Dr. Christopher Lawrence examined T.B. at the emergency room. Dr. Lawrence testified that T.B. sustained the following injuries:

> [A]brasions to the right and left labia, or the outer surface of the vagina, specifically, the right side, the labia majora, which is the larger skin fold, if you will, covering the entrance to the vagina, and the left labia minora, which is the small, thinner, I guess, lip, if you will, which is further inside, right at the entrance to the vagina.

T.B. told Dr. Lawrence that "[Defendant] had sex" with her. Dr. Lawrence felt that this was not a typical response by an eight-year-old, so he had T.B. elaborate. T.B. then told Dr. Lawrence that "he" took her pants off then took his pants off and got on top of her. Dr. Lawrence testified that no semen was detected on the skin or external genitalia of T.B. He noted that T.B.'s hymen was intact. Additionally, there was no bleeding. Dr. Lawrence testified that the abrasions were caused by something slender, rigid, and blunt. Dr. Lawrence further testified that the abrasions could have been caused by a penis.

On cross-examination, Dr. Lawrence was asked if the abrasions could have been caused by a finger and he initially indicated that they could not. He then testified that it was possible the abrasions could have been caused by a finger; however, he stated that a finger was "almost a little too small in diameter" to cause the abrasions. Additionally, Dr. Lawrence testified that T.B. did not indicate she had been digitally penetrated. He further testified that he could not "see how a finger

4

would cause that type of abrasion in both of those places because it's a fairly significant distance," assuming they were both caused at the same time. Dr. Lawrence agreed that it was possible that a finger could have caused one of the abrasions and another insertion of the finger could have caused the other abrasion.

Detective Gary Louviere of the Iberia Parish Sheriff's Office testified at trial. At the time of the crime, he was employed by the New Iberia Police Department and met T.B. at the Emergency Room of the Dauterive Hospital, where he interviewed her. According to Detective Louviere, T.B. did not tell him anything about oral sex. However, Detective Louviere testified that he did not conduct an in-depth interview with T.B. because he was going to have that done at Stuller Place. Detective Louviere did say that at the time he spoke to T.B., she called her assailant "the boy" and did not know his name.

Detective Louviere said that he did not interview S.B. because she was drunk and in a "pretty bad state" at that time. Approximately one week after the incident, he compiled a photo line-up, which he presented to T.B. and S.B. S.B. could not identify anyone from the line-up; however, T.B. selected Defendant within thirty seconds of being shown the line-up.

George Skiroe, an expert in DNA testing and serology, testified that the rape kit performed on T.B. did not reveal any seminal fluid. However, semen was found on an adult T-shirt that was submitted by police. Skiroe further testified that the lack of semen in a rape kit did not evidence a lack of penetration, as penetration can occur without ejaculation.

5

Defendant testified that on the night in question he was offered twelve hundred dollars to babysit T.B., but he told Lamperez and S.B. to take T.B. with them when they left the trailer. However, Lamperez and S.B. left, leaving T.B. behind. He testified that Lamperez later returned to get more beer. After Lamperez left again, Defendant said he locked the door and took a bath. According to Defendant, while he bathed, Lamperez and a Mexican entered the trailer and smoked marijuana.

Defendant then testified that the Mexican took T.B. and put her on the floor and took her clothes off. Defendant said that during that time Lamperez had a knife in his hand and was telling him to shut his mouth. Defendant stated that the Mexican then tried to have sex with T.B. Defendant testified that Lamperez put a knife to his throat and said he would kill him if he did not shut up, to mind his own business, and not to say a word to anyone.

Defendant also testified that after everyone left, with the exception of T.B., he drank water and KoolAid and passed out on the love seat. He claimed that when he woke up, he was numb and could not move. Defendant said that at that time, S.B., T.B., Lamperez, a Mexican, and a heavyset lady, who had been at Lamperez's home earlier that night, were laughing at him. Defendant said that the heavyset woman was putting her private part in his face and S.B. was trying to open his left eye, which was bloody. He then testified that the heavyset woman was on top of him and S.B. was on top of his face. Defendant further testified that "he," presumably Lamperez, had a knife to his throat and Defendant backed off. At that time, "he" grabbed Defendant's hair and shoved Defendant's face into the lady's private part. During this time, according to Defendant, the Mexican was laughing and drinking. Defendant then testified that he saw a midget.

Defendant further testified as follows:

He took his clothes off and put it on top of me. She was asking me who my name was and everything. David Lamperez got my, the knife was in my throat right there.

He told me that he say he's going to kill me if I don't move, or he will hurt me bad. He told me, he said don't push her. Don't get her off of me or nothing. And I can't move anyway. Then she left out there, told her who I was and everything there, want to make love and all of that. I don't know who that was.

. . . .

I was, don't know what's going on. David Lamperez had took his clothes off, and he took her off of me, but I still had my clothes on the whole time, and I saw the little girl, or little midget, I don't know which way it go, and some kind of way, it blocked me. That pill and some kind of medicine that they, I don't know what it was.

Defendant's testimony continued as follows:

They took the little girl, the little midget when I saw her, and he put her on the floor in the kitchen, and some kind of way, he put, if I know about that, if it would be all right, I could tell you. It's a thing a protection of a -- I think it's a rubber. . . .

All I seen this man pour some out and poured it out there, and he put it on his private part, when I'm sitting on this thing right there.

. . . .

When I was sitting on this love seat the whole time with my clothes on, he made me turn to see that person right there, and that person, I don't know who that person was. All I know is a little midget was sitting right there in the front of me, and he was laughing at me. And he -- the midget told me to make love or something like that. She ain't say, she didn't holler or scream or nothing like that. He told me to put it all the way in there, in her private part.

And, some kind of way, he got through with her. She put her clothes back on in the front of me, and she left out of there. . . .

Defendant denied any sexual contact with T.B. He also testified that at the time of the offense at issue he was on probation for sexual battery, which he pled guilty to in 1997. He said that the victim of that offense was fifteen years old.

Defendant makes several arguments regarding whether penetration occurred in this case. He contends that the vague evidence offered by T.B. regarding

7

penile penetration was uncorroborated by medical evidence and was insufficient to support his conviction. He notes that T.B. told the nurse that someone had sex with her and then indicated that the sex had been oral sex. Defendant then asserts that during the child advocacy interview, T.B. said the person used his fingers. He further contends that the "glaring defect" in this case is that the State failed to establish that T.B. knew what "sex" was or if she understood what putting a private "in" a private meant. Defendant argues that it is clear from the record that T.B. did not know what happened to her. He asserts that there are many contradictory statements by T.B. and these inconsistencies are a "critical foundational defect" that the State failed to correct.

In support of his argument, Defendant cites *State v. Marigny*, 532 So.2d 420 (La.App. 1 Cir. 1988). Therein, the fifteen-year-old victim testified that the defendant "had sex" with her. The appellate court found that there was no evidence that the victim understood the phrase "had sex" to mean sexual intercourse. The appellate court further found that the state failed to produce sufficient evidence to indicate there was any penetration and no medical evidence of penetration was presented. Accordingly, the defendant's conviction of carnal knowledge of a juvenile was set aside and a verdict of attempted carnal knowledge of a juvenile was entered. Defendant also asks the court to compare the case at bar to *State v. Wright*, 96-786, p. 8 (La.App. 3 Cir. 2/19/97), 690 So.2d 850, 856, *writ denied*, 97-0665 (La. 9/26/97), 701 So.2d 978, wherein the victim testified that the defendant "stuck his penis in my behind."

Defendant points out that the doctor noted only "external abrasions" as evidence of sexual activity. He asserts that the doctor testified that the abrasions could have been caused by someone's finger, which supports T.B.'s testimony that

8

Defendant rubbed lotion on her "private." Defendant also claims that it is significant that the State did not ask the doctor the fundamental question of whether or not there was medical evidence of penetration, however slight. Defendant then argues that there is a great likelihood that penetration in this matter was digital and would not support a conviction for aggravated rape. Accordingly, he avers that at best the evidence proved he committed sexual battery.

On the other hand, the State contends the evidence is sufficient to support Defendant's conviction and cites *State v. Patterson*, 05-560 (La.App. 5 Cir. 1/31/06), 922 So.2d 1195, in support of its argument. In *Patterson*, the victim testified that the defendant did not fully penetrate her, but that his penis entered her vagina by an inch. The victim told the nurse that she did not think the defendant "went in" and "[h]e couldn't get it in." *Id*. at 1199. When the doctor asked if she had been penetrated, the victim immediately answered that she did not know. The doctor testified that during his examination of the victim he did not observe any visible tears and noted she appeared "virginal." *Id*. Additionally, the victim did not remember telling the first responding officer that the defendant raped her until her mother returned home. Our colleagues on the Fifth Circuit Court of Appeal found that the victim's testimony was not irreconcilable with the physical evidence. The appellate court additionally noted that while the victim's responses to the nurse and doctor were not as clear as her testimony, it was "reasonable to conclude that her lack of clarity was due to her inexperience with sexual intercourse." *Id*. at 1202. The appellate court in *Patterson*, cited *State v. Hubbard*, 97-916 (La.App. 5 Cir. 1/27/98), 708 So.2d 1099, *writ denied*, 98-0643 (La. 8/28/98), 723 So.2d 415, wherein that court found the evidence was sufficient to prove the element of penetration when the victim testified that the defendant made her "have sex" with him and answered

9

affirmatively when asked whether the defendant raped her. We note the victim's testimony in *Patterson* was corroborated by two other witnesses.

Defendant's assertion that T.B. did not know what "sex" is may be true; however, T.B. testified that Defendant put his private in her private. Defendant may argue that the State did not clarify what that meant; however, T.B.'s testimony is clear. Additionally, during the child advocacy interview, T.B. was asked to place a crayon under a table, place a crayon on a table, and to place the crayon in the crayon box. T.B. accurately complied with these requests. Accordingly, it is clear that T.B. understands what the word "in" means. Further, it appears from the interview that T.B. understands what male and female private parts are and where they are found.

We are cognizant that there were inconsistencies in T.B.'s version of the events that occurred on June 3, 2004. T.B. told the nurse at the emergency room that there had been oral sex and was unsure whether anal or vaginal penetration had occurred. She told Lavergne, the interviewer at the advocacy center, that Defendant put his private in her private and did not tell the interviewer that oral sex had occurred. Furthermore, T.B. testified that Defendant put his private in her private and that she told the interviewer that he put his private in her mouth. T.B. then indicated that Defendant did put his private in her mouth. We are confident that the jury was aware of what T.B. said occurred on June 3, 2004, and chose to believe a portion of T.B.'s testimony, as reflected by the verdict. Additionally, as in *Patterson*, 922 So.2d 1195, T.B.'s testimony may be clearer than her initial reports due to her inexperience with sexual activity.

> Furthermore, "[t]he fact that the record contains evidence which conflicts with the testimony accepted by the trier of fact does not render the evidence accepted by the trier of fact insufficient." *State v. Holley*, 01-0254, p. 6 (La.App. 3 Cir. 10/3/01), 799 So.2d 578, 583, *citing State v. Tompkins*, 403 So.2d 644 (La.1981), *appeal after remand*, 429 So.2d 1385 (La.1982).

*State v. Schexnaider*, 03-144, p. 9 (La.App. 3 Cir. 6/4/03), 852 So.2d 450, 456-57.

We find that *Marigny*, 532 So.2d 420, is distinguishable from the case at bar in that T.B. did more than testify that Defendant had sex with her. T.B. testified that he placed his private in her private.

> "[T]he credibility of a witness, including the victim, is within the discretion of the trier of fact, who may accept or reject, in whole or in part, the testimony of any witness. '[T]he *Jackson* standard does not serve as a vehicle for a reviewing court to second guess the rational credibility determinations of the fact finder at trial.'" [*State v.*] *Schexnaider*, [03-144, p. 9 (La.App. 3 Cir. 6/4/03),] 852 So.2d [450] at 457 (citations omitted), *quoting State v. Williams*, 00-981, p. 7 (La.App. 5 Cir. 4/11/01), 786 So.2d 805, 810, *writ denied*, 01-1377 (La.3/20/02), 812 So.2d 646. Furthermore, the testimony of the victim alone is sufficient to establish the elements of a sexual offense. *Id*.

*State v. Willis*, 05-218, p. 15 (La.App. 3 Cir. 11/2/05), 915 So.2d 365, 378-79, *writ denied*, 06-0186 (La. 6/23/06), 930 So.2d 973.

We further find that the abrasions prove there was penetration, however slight, whether it be digital or penial penetration into the external features of the female genitalia. Further, the verdict may indicate the jury chose to believe T.B.'s testimony that Defendant put his private in her private, thus finding that penile penetration occurred.

Aggravated rape may also be proven when oral sex occurs. Therefore, the jury verdict may indicate the jury believed T.B.'s testimony and her report to the emergency room nurse that Defendant placed his private in her mouth. We hold that the State proved the elements of the crime of aggravated rape beyond a reasonable doubt. Accordingly, this assignment of error lacks merit.

### EXCESSIVE SENTENCE

In his second assignment of error, Defendant contends his life sentence is unconstitutionally excessive in light of his mental retardation. He argues that the imposition of a life sentence without consideration of his mental defect as a

11

mitigating factor resulted in his receiving an excessive sentence. In support of his argument, Defendant cites *State v. Dorthey*, 623 So.2d 1276 (La.1993), and *Atkins v. Virginia*, 536 U.S. 304, 122 S.Ct. 2242 (2002).

The record does not indicate that Defendant filed a motion to reconsider sentence, nor does the record indicate that he orally objected to the sentence at the sentencing hearing. According to La.Code Crim.P. art. 881.1, failure to make or file a motion to reconsider sentence precludes a defendant from raising, on appeal, any objection to the sentence. When the record does not indicate that any objection was made regarding sentencing, the defendant is precluded from appealing his sentence. *State v. Williams*, 01-998 (La.App. 3 Cir. 2/6/02), 815 So.2d 908, *writ denied*, 02-0578 (La. 1/31/03), 836 So.2d 59.

Defendant's sentencing claim is barred pursuant to Article 881.1. However, we will review his sentence for bare excessiveness in the interest of justice. *State v. Graves*, 01-0156 (La.App. 3 Cir. 10/3/01), 798 So.2d 1090, *writ denied*, 02-029 (La. 10/14/02), 827 So.2d 420.

Louisiana Revised Statue 14:42 provides a mandatory life sentence for aggravated rape cases in which the death penalty is not sought or not otherwise available. In *State v. Foley*, 456 So.2d 979, 981 (La.1984), the supreme court discussed the penalty for aggravated rape as follows:

> The mandatory life sentence for aggravated rape is a valid exercise of the state legislature's preogative to determine the length of sentence for crimes classified as felonies. *State v. Prestridge*, 399 So.2d 564 (La.1981); *State v. Farria*, 412 So.2d 577 (La.1982); and *State v. Talbert*, 416 So.2d 97 (La.1982).

Based on *Foley*, Defendant's life sentence is mandatory and can not be excessive. Accordingly, this assignment of error lacks merit.

**CONCLUSION**

Defendant's conviction and sentence are affirmed.

_____**AFFIRMED.**