NOT DESIGNATED FOR PUBLICATION

STATE OF LOUISIANA
COURT OF APPEAL, THIRD CIRCUIT

13-30

STATE OF LOUISIANA

VERSUS

THOMAS KIRK GATON

\*\*\*\*\*\*\*\*\*\*

APPEAL FROM THE
FIFTEENTH JUDICIAL DISTRICT COURT
PARISH OF VERMILION, NO. 48267
HONORABLE DURWOOD W. CONQUE, DISTRICT JUDGE

\*\*\*\*\*\*\*\*\*\*

PHYLLIS M. KEATY
JUDGE

\*\*\*\*\*\*\*\*\*\*

Court composed of J. David Painter, Shannon J. Gremillion, and Phyllis M. Keaty, Judges.

AFFIRMED.

Kevin V. Boshea
Attorney at Law
2955 Ridgelake Drive, Suite 207
Metairie, Louisiana  70002
(504) 834-2114
Counsel for Defendant/Appellant:
    Thomas Kirk Gaton

**Michael Harson**
**District Attorney**
**Ted L. Ayo**
**Assistant District Attorney**
**100 North State Street, Suite 215**
**Abbeville, Louisiana  70510**
**(337) 898-4320**
**Counsel for Appellee:**
**        State of Louisiana**

**KEATY, Judge.**

Defendant, Thomas Kirk Gaton, was charged by indictment with aggravated rape, a violation of La.R.S. 14:42. He filed a written plea of not guilty. Trial by jury commenced on June 21, 2012, and Defendant was found guilty of the aggravated rape of C.T., a child under the age of thirteen.[1] On July 23, 2012, Defendant was sentenced to life imprisonment without benefit of probation, parole, or suspension of sentence.

Defendant timely appealed and is now before this court asserting five assignments of error. Therein, he contends that: 1) the verdict is contrary to the law and evidence; 2) the prosecution repeatedly referenced his post-arrest silence; 3) the trial court erred in denying his motion to quash the indictment; 4) he was denied his right to counsel at trial; and 5) the videotape of the victim was incompetent evidence which should not have been admitted at trial. For the following reasons, we affirm Defendant's conviction.

## DISCUSSION

### *Assignment of Error Number One*

In his first assignment of error, Defendant contends the verdict is contrary to the law and evidence.

> The standard of review in a sufficiency of the evidence claim is "whether, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found proof beyond a reasonable doubt of each of the essential elements of the crime charged." *State v. Leger*, 05-11, p. 91 (La.7/10/06), 936 So.2d 108, 170, *cert. denied*, 549 U.S. 1221, 127 S.Ct. 1279, 167 L.Ed.2d 100 (2007) (citing *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); *State v. Captville*, 448 So.2d 676, 678 (La.1984)). The *Jackson* standard of review is now legislatively embodied in La.Code Crim.P. art. 821. It does not allow the appellate court "to substitute its own appreciation of the evidence for that of the

---

[1] The victim's initials are being used in accordance with La.R.S. 46:1844(W).

fact-finder." *State v. Pigford*, 05-477, p. 6 (La.2/22/06), 922 So.2d 517, 521 (citing *State v. Robertson*, 96-1048 (La.10/4/96), 680 So.2d 1165; *State v. Lubrano*, 563 So.2d 847, 850 (La.1990)). The appellate court's function is not to assess the credibility of witnesses or reweigh the evidence. *State v. Smith*, 94-3116 (La.10/16/95), 661 So.2d 442.

The fact finder's role is to weigh the credibility of witnesses. *State v. Ryan*, 07-504 (La.App. 3 Cir. 11/7/07), 969 So.2d 1268. Thus, other than insuring that the sufficiency evaluation standard of *Jackson* is met, "the appellate court should not second-guess the credibility determination of the trier of fact," but rather, it should defer to the rational credibility and evidentiary determinations of the jury. *Id.* at 1270 (quoting *State v. Lambert*, 97-64, pp. 4-5 (La.App. 3 Cir. 9/30/98), 720 So.2d 724, 726-27). Our supreme court has stated:

> However, an appellate court may impinge on the fact finders discretion and its role in determining the credibility of witnesses "only to the extent necessary to guarantee the fundamental due process of law." *State v. Mussall*, 523 So.2d 1305, 1310 (La.1988). In determining the sufficiency of the evidence supporting a conviction, an appellate court must preserve " 'the factfinders role as weigher of the evidence' by reviewing 'all of the evidence . . . in the light most favorable to the prosecution.' " *McDaniel v. Brown*, 558 U.S. 120, —, 130 S.Ct. 665, 674, 175 L.Ed.2d 582 (quoting *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979)). When so viewed by an appellate court, the relevant question is whether, on the evidence presented at trial, "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson*, 443 U.S. at 319, 99 S.Ct. at 2789. Applied in cases relying on circumstantial evidence, . . . this fundamental principle of review means that when a jury "reasonably rejects the hypothesis of innocence presented by the defendant[ ], that hypothesis falls, and the defendant is guilty unless there is another hypothesis which raises a reasonable doubt." *State v. Captville*, 448 So.2d 676, 680 (La.1984).

*State v. Strother*, 09-2357, pp. 10-11 (La.10/22/10), 49 So.3d 372, 378.

*State v. Teno*, 12-357, pp. 7-8 (La.App. 3 Cir. 11/7/12), 101 So.3d 1068, 1073-74.

Defendant was convicted of aggravated rape of a child under the age of thirteen. Louisiana Revised Statutes 14:42 provides, in pertinent part, as follows:

A. Aggravated rape is a rape committed upon a person sixty-five years of age or older or where the anal, oral, or vaginal sexual intercourse is deemed to be without lawful consent of the victim because it is committed under any one or more of the following circumstances:

. . . .

(4) When the victim is under the age of thirteen years. Lack of knowledge of the victim's age shall not be a defense.

Sergeant Regina Hargrave, an employee of the Vermilion Parish Sheriff's Office, testified that the allegations at issue were brought to her attention on September 10, 2007, regarding events that allegedly took place in the summer of 2006. C.T.'s mother made a telephone complaint regarding Defendant. Sergeant Hargrave testified that C.T. was brought for a physical examination on September 19, 2007. That examination revealed a small laceration to the clitoris and skin excavation around the anus; however, the hymen was intact. Sergeant Hargrave was unable to determine when the laceration and skin excavation occurred.

Nicolette Joseph was employed by Hearts of Hope, a children's advocacy and sexual abuse response center. She was accepted as an expert in forensic interviewing. Joseph interviewed C.T. on September 18, 2007. During the interview, C.T. stated that she went to the doctor because someone was "messing with" her. When asked who had been "messing with" her, she said, "Thomas." C.T. then stated no one had touched her "tootie," which is what she called her vagina. She stated that she had been kissed "there and all down there," gesturing from her chest all the way down to her vaginal area. When asked who had done that, C.T. stated, "Danny no Thomas." She indicated her clothes were on during the incident, and she was three years old at that time. C.T. also stated Thomas had

touched her breasts and put his finger in her vagina while her clothes were "off on." C.T. stated that the events occurred while she was at home in the kitchen getting a snack and standing on a chair. Her father was offshore at the time, and her mother was at work. C.T. also stated that, while standing on a chair, Thomas made her put her mouth on his private. His clothes were on and his "thing" touched the inside of her mouth. C.T. first said this happened "six days" but later said this happened twenty-five times. C.T. indicated that yellow "pee pee" came out of Thomas's "thing" and went into her mouth. She then choked and had to go to the doctor. C.T. also said that Thomas made her kiss his "boobies" and "tootie." C.T. indicated it was light outside and cold when these events occurred. C.T. also stated that Thomas's "thing" went inside her "tootie" and that her clothes were on. C.T. said Thomas stopped because C.T.'s brother got a gun. C.T. identified parts of the female body on a drawing. She then said no one had touched her "boobies," "tootie," or buttocks, and no one asked her to touch their "boobies" or "tootie." At the conclusion of the interview, C.T. was questioned about whether she knew the difference between the truth and a lie, and she indicated that she did know the difference between them. At trial, Joseph agreed that, during the interview, C.T. seemed more concerned about playing with Play-Doh and that C.T. did not cry or seem distraught.

On cross-examination, Joseph acknowledged that C.T.'s story changed during their interview regarding whether the incident actually took place, the identity of the alleged perpetrator, and the number of times the abuse occurred. Joseph stated that she did not ask C.T. who Danny was, instead focusing on Defendant because that was the name law enforcement gave her prior to the interview. Finally, Joseph related that it was not until the end of C.T.'s interview

4

that she established that C.T. knew the difference between telling the truth and telling a lie. Nevertheless, C.T. confirmed to Joseph that she had told the truth during the interview.

Shannon Thornton, C.T.'s mother, testified that Defendant lived at her home in 2006 when he worked with her husband. At that time, C.T. was three or four, Logan was seven or eight, and A.J. was two. C.T.'s birth certificate was introduced into evidence and indicated her date of birth as October 10, 2002. Shannon testified that Defendant began to live with them during the summer and stayed there for six to eight months. Shannon allowed Defendant to babysit her two older children when she and her husband were working.

Shannon testified that one day her kids were in the bathroom playing in the tub when Logan screamed. She determined that C.T. tried to put her mouth on Logan's private part. Shannon asked C.T. why she was doing that and where she had learned such a thing. After making her "pinky promise" not to say anything, C.T. eventually told Shannon that Defendant made her put his privates in her mouth and "do things." Shannon immediately called her husband who was working offshore and asked him to fly back into town. They called the police the day C.T. revealed the abuse or the following morning.

Shannon stated that she never allowed C.T. to tell her more than when the events were first reported by her and that she did not tell C.T. what to say during her interview with Joseph. Shannon testified that she did not recall the terminology the doctor used after C.T.'s examination, but she was basically told "that C.T. no longer had what females consider their cherry . . . that there was some tear in that area."

Shannon testified that Defendant did not contribute to the household financially. According to Shannon, she corrected Defendant several times for watching pornography in front of her children.

Shannon testified that in 2007, her ex-husband's nephew, Jonathan Hernandez, lived in a camper in their backyard. Shannon first stated that Hernandez never babysat her children and that he was never alone with them, but she later admitted that she may have left the children with him for a short time while she went to the store. Hernandez never bathed her children. According to Shannon, she only recently discovered that Hernandez was a registered sex offender. Shannon testified that her ex-husband's cousin, Danny, and his wife had also lived in the house with her family in 2007; however, Danny was never alone with her children.

Logan Thornton was nine years old in 2006. He testified that he saw Defendant put his hand under C.T.'s shirt several times and put his hand under her shorts or skirt. He saw these things occur once on the kitchen counter, once in C.T.'s bedroom, and once in the bathroom. Logan testified that these events took place in the summer. Logan further testified that he never saw Danny or Jonathan do anything to C.T.

Logan testified that he witnessed between three and five incidents involving Defendant and C.T. During the first incident, Defendant was in bed with C.T., and C.T. was not wearing any clothes. The second incident occurred in the bathroom when Defendant was taking off C.T.'s clothes. The third and fourth incidents occurred in the kitchen on the same day. Defendant had his hands under C.T.'s shirt at one point and up her skirt at another. Defendant was standing and C.T. was sitting on the counter. When he saw the Defendant's hand under C.T.'s shirt,

6

Logan told Defendant to leave C.T. alone. Logan stated that he was interviewed by Sergeant Hargrave about the incidents involving Defendant and C.T.

C.T. testified that Defendant stayed with her and Logan by themselves once, and, during that time, her clothes were off, and Defendant "touched me with his private in my privates, and he put his private in my mouth, and "his white stuff" went into her mouth. C.T. testified that she spit out the white stuff. C.T. denied that Defendant ever put his hands under her dress. C.T. explained the events at issue occurred in the kitchen when she was trying to get a snack. She was standing on a chair, and Defendant stood next to the chair

The defense presented two witnesses at trial. Samara Gaton, Defendant's twelve-year-old daughter, testified that Defendant never did anything inappropriate to her. Defendant also took the stand in support of his defense. He testified that he lived in Louisiana from June to mid-August of 2006. He initially stayed at the Southland Inn, a hotel near Parker Drilling, where he was trying to find work. He ended up working at Fluid Crane, where he met Jason Newell, C.T.'s step-father. Defendant stated that he was invited to live in a camper in Newell's backyard at the end of June but did not stay there until after July 4, 2006. Upon arriving and finding wasps in the camper, Shannon told him he could stay in the house. Defendant testified that he did not pay rent but did pay for groceries, in addition to installing radios, doing yard work, cleaning the pools, and cleaning the truck.

Defendant testified that he moved out of the residence in August. He returned in late August or early September to get his check, and Newell told him he could not have it. Defendant testified Shannon held his check and wanted six hundred dollars from him for staying with them.

7

Defendant testified that he babysat Logan once and never babysat C.T. He denied ever inappropriately touching C.T., putting his finger in her private, putting his private in her mouth, kissing her, or putting his private in her private. Defendant testified that he had prior convictions for D.W.I., possession of marijuana, theft under five hundred dollars, and evading arrest.

In brief to this court, Defendant submits that there were contradictions in the testimony and evidence presented at trial. Defendant asserts that C.T. initially denied anything happened to her. She then stated Danny was responsible. During her interview, C.T. claimed Defendant put his penis in her vagina and digitally penetrated her; however, at trial, she asserted Defendant placed his penis in her mouth but did not mention the other types of sexual conduct. C.T. also denied that Defendant placed his hands under her dress, while Logan testified that he saw Defendant place his hands under C.T.'s skirt several times.

Defendant also notes that during her interview, C.T. stated that the events happened twenty-five times with her clothes on, and, at trial, she described one incident in which she was naked. Defendant asserts that Logan stated C.T. was naked at the time of his observations, which involved Defendant placing his hands under C.T.'s shirt and skirt.

Defendant faults law enforcement for failing to investigate Danny or Hernandez. He also faults Joseph for failing to initially tell C.T. to tell the truth during her interview. He points to Joseph's acknowledgment that C.T.'s story changed quite a bit during her interview. Defendant further argues that there was no physical evidence to corroborate the allegations against him.

The State asserts that the evidence is sufficient to support Defendant's conviction. In support of that contention, the State cites *State v. Broussard*, 95-792

8

(La.App. 3 Cir. 12/6/95), 664 So.2d 835. In *Broussard*, the defendant was convicted of oral sexual battery for performing oral sex on the six-year-old victim and making her perform oral sex on him. On appeal, the defendant argued that because the victim's sworn testimony at trial and her unsworn testimony in a videotaped interview conflicted, the sworn testimony should prevail.

In her videotaped statement, the victim in *Broussard* stated that, while in the rocking chair, the defendant made her suck his bottom and he licked hers. At trial, the victim testified the defendant merely kissed her while they were in a rocking chair. The victim's mother testified that the victim told her the defendant made her suck his penis while they were on a reclining chair. This court found the evidence, when viewed in a light most favorable to the prosecution, showed the defendant made the victim perform oral sex. This court further found:

> We decline Broussard's invitation to review the jury decision and accord greater weight to T.C.'s trial testimony. The jury was free to ascribe T.C.'s trial testimony whatever weight it judged reasonable, or none "at all" if it found T.C.'s taped testimony and the recollection of her mother were more credible and accurate. The record supports the jury's findings, and we will not reevaluate the credibility of the witnesses. *See State v. Pontiff*, 604 So.2d 71 (La.App. 3 Cir.1992).

*Id.* at 840.

In *State v. Simmons*, 03-20 (La.App. 5 Cir. 4/29/03), 845 So.2d 1249, the defendant was convicted of aggravated rape and aggravated crime against nature. On appeal, the defendant argued the victim's testimony was unreliable, as there were inconsistencies in her testimony. On appeal, the fifth circuit noted:

> Although there may be slight inconsistencies in minor details of the events surrounding her attack, the child never wavered in her statement—to her mother, Officer Carrone, Dr. Benton, Omalle Gordon, and, finally, at trial—that defendant put his "thing" in her mouth and "down there," i.e. in her vagina. Further, the alleged discrepancies are not necessarily indicative of untruthfulness or incompetence. Rather, memory lapse and alleged inconsistencies may

have resulted from the child's tender age—5-years-old—on the date of the incident; the traumatic nature of the experience; exposure to unfamiliar surroundings; or the method of interrogation. *See*, *State v. Foy*, 439 So.2d 433, 434 (La.1983).

*Id.* at 1258.

In *State v. Vincent*, 07-239 (La.App. 5 Cir. 12/27/07), 978 So.2d 967, the defendant was convicted of oral sexual battery and sexual battery committed upon two victims, M and F, who were twelve or thirteen years old. On appeal, the defendant argued the evidence was legally insufficient to support the verdicts because the trial testimony was conflicting and contradictory, and his argument addressed the credibility of the victims. The trial court noted the inconsistencies in denying the defendant's motion for new trial "but found that the victims were very young and that juries 'don't' hold them to the accountability of being perfect.'" *Id.* at 972.

The fifth circuit affirmed the convictions, stating:

> There are some inconsistencies in the testimony. For example, F testified that the sexual battery took place once; M stated that it happened to F twice. M's version of the sequence of events differed from F's. In her recorded statement, F stated that M was in the room with Vincent first, then he pushed her out. F testified that she was in Vincent's bedroom on that occasion for thirty minutes; however, M thought that F was in there five or ten minutes. F testified that Helen came home while she was still with Vincent; M testified that Vincent called her into the room after he was finished with F. M testified that she and F had spent the night at Helen's house on that occasion, but F testified that, after the incident, she and M walked to F's house that evening.
>
> . . . .
>
> Furthermore,
>
> > [w]hen a witness is impeached, this simply means the jury, as the trier of fact, is presented with evidence which it could consider and weigh in determining the credibility, or believability, of a witness. Simply because the witness may have been impeached by prior

10

> inconsistent statements does not mean that the jury is prohibited from believing anything said by the witness. The inconsistencies in the witness's statements are one of any number of factors the jury weighs in determining whether or not to believe a witness's trial testimony.
>
> Here the jury chose to believe the victims. They had the opportunity to hear and consider all of the testimony, and defense counsel was able to effectively cross-examine the witnesses. Further, the major inconsistencies were detailed in the closing argument. The victims were quite consistent in their testimony as to what Vincent did to them. We have no reason to second-guess the credibility finding. The jury could have reasonably determined, based on all the evidence, that Vincent committed the offenses with which he was charged and that the young victims simply had trouble remembering some of the minor details of the incidents. Viewing the evidence in the light most favorable to the State, we find that a rational juror could have found that the State proved the essential elements of the crimes of oral sexual battery beyond a reasonable doubt, thus satisfying the *Jackson* standard.

*Id.* at 972-73 (footnotes omitted).

In *State v. C.S.*, 10-507 (La.App. 3 Cir. 11/17/10), 50 So.3d 983, the defendant was convicted of the aggravated rape of his six-year-old daughter. On appeal, the defendant implied the victim's testimony was not credible because she had changed her accusation of who abused her several times. The defendant filed a complaint with police alleging his former girlfriend's brother had abused the victim. After the victim was removed from the defendant's custody, she stated the defendant abused her, and she consistently maintained that position through the trial. In affirming the defendant's conviction and sentence, we stated:

> In *State v. Rideaux*, 05-446, p. 2 (La.App. 3 Cir. 11/2/05), 916 So.2d 488, 491, this court quoted the following ruling in *State v. Roca*, 03-1076, pp. 11-12 (La.App. 5 Cir. 1/13/04), 866 So.2d 867, 874, *writ denied*, 04-583 (La.7/2/04), 877 So.2d 143, which in pertinent part stated: "In the absence of internal contradiction or irreconcilable conflict with physical evidence, one witness's testimony, if believed by the trier of fact, is sufficient support for a requisite factual finding."

11

Considering the evidence in a light most favorable to the prosecution, sufficient evidence exists to sustain the verdict of aggravated rape of a child under the age of thirteen years.

*Id.* at 986.

In *State v. Waguespack*, 06-410 (La.App. 3 Cir. 9/27/06), 939 So.2d 636, the defendant was convicted of aggravated rape. On appeal, this court, after recognizing that there were inconsistencies in the versions of events given by the victim at the emergency room, the advocacy center, and at trial, stated:

T.B.'s testimony may be clearer than her initial reports due to her inexperience with sexual activity.

Furthermore, "[t]he fact that the record contains evidence which conflicts with the testimony accepted by the trier of fact does not render the evidence accepted by the trier of fact insufficient." *State v. Holley*, 01-0254, p. 6 (La.App. 3 Cir. 10/3/01), 799 So.2d 578, 583, *citing State v. Tompkins*, 403 So.2d 644 (La.1981), *appeal after remand*, 429 So.2d 1385 (La.1982).

*State v. Schexnaider*, 03-144, p. 9 (La.App. 3 Cir. 6/4/03), 852 So.2d 450, 456-57.

*Id.* at 642-43.

In the instant matter, the jury heard the inconsistencies detailed during C.T.'s interview and her testimony at trial. C.T. merely mentioned Danny once during her interview and never referred to him again. C.T. reported to her mother and Joseph that the acts were committed by Defendant and testified in the same manner at trial. The jury, as the trier of fact, was free to accept any part of C.T.'s testimony. The jury could have determined that, as in *Simmons*, 845 So.2d 1249, and *Vincent*, 978 So.2d 967, any inconsistencies in C.T.'s claims were due to C.T.'s age at the time of the offense. The verdict clearly indicates the jury chose to believe Defendant committed the acts against C.T. That credibility determination should not be second-guessed by this court. Based on the decisions cited herein,

12

the evidence was sufficient to support Defendant's conviction, as C.T. stated during her interview and at trial that Defendant placed his private in her mouth. Accordingly, Defendant's first assignment of error lacks merit.

## *Assignment of Error Number Two*

In his second assignment of error, Defendant contends that the prosecution repeatedly referenced his post-arrest silence contrary to the tenets of *Doyle v. Ohio*, 426 U.S. 610, 96 S.Ct. 2240 (1976), and its progeny.

During her testimony, Sergeant Hargrave was questioned as follows:

Q. Did you question him?

A. I attempted to when he was at the jail, but he stated he wanted his attorney present whenever we did speak with him.

. . . .

Q. And did his attorney ever contact you to allow –

A. Not for an interview, no, sir.

The State made the following remarks during its closing argument: "If the defendant took a polygraph, it wasn't with the sheriff's department. It might have been something his attorney set up, because he had claimed that he wanted a lawyer."[2]

Defendant contends these excerpts represent direct references to his post-arrest silence, which violates the Supreme Court's ruling in *Doyle*. *Doyle* prohibits the State from impeaching an accused who testifies at the guilt phase of trial with his decision to remain silent after receiving *Miranda* warnings during the investigation of the crime.

---

[2] On direct examination, Defendant testified that he told the "absolute truth" during a polygraph test.

13

In *State v. Arvie*, 505 So.2d 44 (La.1987), the defendant sought appellate review of the State's use of his post-arrest silence for impeachment purposes and had not objected to the State's questions that elicited the information. The supreme court found the circumstances of the case did not warrant making an exception to the contemporaneous objection rule. *See also State v. Collins*, 09-283 (La.App. 5 Cir. 12/8/09), 30 So.3d 72, *writ denied*, 10-34 (La. 9/3/10), 44 So.3d 696. Defendant failed to object during Sergeant Hargrave's testimony and the State's closing argument. Based on the cases cited herein, we conclude that Defendant failed to preserve this issue for appellate review.

## *Assignment of Error Number Three*

In his third assignment of error, Defendant contends that the trial court erred in denying his motion to quash indictment. Defendant filed a motion to quash on June 18, 2012. The trial court denied the motion at a hearing held on June 19, 2012. Defendant subsequently applied for supervisory writs in this court, and on June 21, 2012, we issued the following ruling:

> **<u>WRIT DENIED; STAY DENIED</u>:** We find no error in the trial court's ruling denying the Defendant's motion to quash. Accordingly, the Defendant's writ application is hereby denied.

In *State v. Marinello*, 09-1260, pp. 31-32 (La.App. 3 Cir. 10/6/10), 49 So.3d 488, 507, *writs denied*, 10-2494, 10-2534 (La. 3/25/11), 61 So.3d 660, 661, we held:

> In *State v. Chambers*, 99-678 (La.App. 3 Cir. 1/19/00), 758 So.2d 231, *writ denied*, 00-551 (La.9/22/00), 768 So.2d 600 this court explained that a defendant may seek review of a pretrial ruling even after the denial of a pretrial supervisory writ application seeking review of the same issue. However, when a defendant does not present additional evidence on the issue after the pre-trial ruling, the issue can be rejected on appeal. *Id.* Judicial efficiency demands that this court accord great deference to its pre-trial decision unless it is

apparent that the determination was patently erroneous and produced unjust results. *Id.*

In brief to this court, Defendant makes a new argument regarding "actual notice," asserting the following:

In State v. Romar, 07-2140 (La. 7/1/08) 985 So. 2d 722, it was noted that the Legislature amended La. C. Cr. P. art. 579 to add a third ground of interruption. That is, that the defendant 'fails to appear at any proceeding pursuant to actual notice, proof of which appears of record' 1984 Acts 671. In Romar, the defendant received actual notice in court. As stated, there is no proof of <u>actual notice in the record</u> in the instant case. Nor is there even proof of oral notice given to Mr. Gaton.

Defendant also cites *State v. Peters*, 10-939 (La.App. 4 Cir. 11/17/10), 52 So.3d 233; *State v. Sorden*, 09-1416 (La.App. 4 Cir. 8/4/10), 45 So.3d 181; and *State v. Carcamo*, 03-589 (La.App. 5 Cir. 10/28/03), 860 So.2d 220. He then states:

As stated the period of prosecution for non-capital cases was interrupted, if the defendant failed to appear at any proceeding pursuant to <u>actual notice</u>. Here, there is simply no evidence of actual notice, either oral, written or by means of subpoena. The Motion to Quash filed in this matter should have been granted.

In this case, there was no argument in the trial court by the State that the time to institute prosecution was interrupted because Defendant received actual notice of the trial date and failed to appear. Additionally, Defendant did not present any new evidence on the issue after the pretrial ruling. For these reasons, we will not review this assignment of error.

### *Assignment of Error Number Four*

In his fourth assignment of error, Defendant contends he was denied his right to counsel at trial. Defendant notes that Amanda Martin was appointed as his counsel on June 22, 2011, but when she was unable to properly represent him at trial, Jermaine Williams, "who simply may have been in Court that day[,]" took over the case for that day. Williams participated in voir dire, made the opening

15

statement, and cross-examined Joseph, the main investigative witnesses. However, on the second day of trial, Williams was not present, but attorney Harry Brown was seated at the defense table with Martin. Thereafter, the State sought to have Brown enroll in the case, and the trial court inquired of Martin "[h]ow many lawyers are going to enroll in this case?" After Martin assured the trial court that Brown would not question any witnesses or address the jury, the trial court stated that he did not need to enroll.

Defendant contends that Williams was never appointed to represent him, and Defendant did not consent to Williams's participation. Further, Defendant argues that "the failure of Mr. Williams who never met Mr. Gaton prior to the immediate state [sic] of the trial to engage in significant participation at trial, constitutes the constructive denial of counsel." Defendant then cites *State v. Laugand*, 99-1124 (La. 3/17/00), 759 So.2d 34; *State v. Addison*, 94-2745 (La. 6/23/95), 657 So.2d 974; and *State v. Knight*, 611 So.2d 1381 (La.1993).[3]

In *Knight*, 611 So.2d 1381, the attorney handling the matter was on vacation, and the trial court refused to grant a continuance even though the attorney filling in knew nothing about the case. New counsel presented no defense but did cross-examine the State's witnesses. The supreme court reversed the defendant's conviction and remanded the matter for further proceedings, finding the trial court constructively denied counsel to the defendant. The supreme court found there was no significant difference between what happened and the complete absence of counsel.

---

[3] Defendant admits that in the above-cited cases, defense counsels sought continuances but no continuance was sought in the case at bar.

16

In *Laugand*, 759 So.2d 34, defense counsel appeared in court on the day of trial claiming that he was fresh from trial in another parish and, because of a scheduling conflict, he had been unable to prepare the defendant's case for trial. Defense counsel was therefore physically available to try the case and, after the trial court denied his motion for a continuance, cross-examined the State's witnesses and argued the case to jurors at the close of evidence. The supreme court set aside the defendant's conviction because defense counsel was not prepared, and the trial court had to intervene to keep defense counsel from pursuing matters that appeared directly adverse to the defendant's interests.

In *Addison*, 657 So.2d 974, the defendant had been represented by various attorneys from the public defender's office, and on the morning of trial, the attorney who had represented the defendant at only a bail reduction hearing appeared and moved for a continuance. The trial court denied the motion, noting that different public defenders had been substituting in and out of the case. The supreme court found that the record did not establish ineffective assistance and prejudice but found that a showing by the defendant at a subsequent hearing that his new attorney was totally unprepared might entitle him to a new trial. The supreme court concluded that it was appropriate to conditionally affirm the conviction and to remand for a hearing, in the nature of a hearing on a motion for new trial, to determine whether the defendant received effective assistance of counsel and, if not, to determine whether he suffered prejudice from such failure.

The State counters that Williams is an attorney for hire and would not have been appointed by the trial court. The State further asserts that Williams's presence was facilitated by Defendant, who did not want the matter to be continued. The State submits that Martin was prepared to proceed to trial, but

17

Defendant retained the services of Williams, and Brown was present to assist Martin with research or prepare another supervisory writ application. The State further asserts that no one declared that the defense was not prepared to proceed to trial, and Defendant did not object to the presence of Williams or Brown. Finally, the State points out that in each of the cases cited by Defendant, a motion to continue was urged, and no such motion was made in the case at bar.

Martin was appointed to represent Defendant on June 22, 2011.[4] Martin represented Defendant at trial on June 21, 2012. The minutes of court indicate that, on that date, Williams moved to enroll as co-counsel, and his motion was granted. The minutes do not indicate Williams was present on June 22, 2012. On that date, attorney Brown was present in court with Martin but did not enroll because he would not be questioning any witnesses. Brown did stand in for Martin at the sentencing hearing held on July 23, 2012, where Defendant stated:

> I never authorized Mr. Williams to represent me on Thursday, and he had looked at my case for maybe 10 minutes when he was representing me, and then he didn't even show up on Friday. And it just -- I just didn't -- Ms. Martin had had a death in the family, and I think everybody can say in here that she couldn't -- she couldn't even compose herself or make a -- he had to take over, and he had no idea about my case. Just -- I just don't think -- I didn't get a fair trial, sir.

In *State v. Johnson*, 04-178 (La.App. 4 Cir. 12/8/04), 892 So.2d 28, *writ denied*, 05-87 (La. 4/22/05), 899 So.2d 556, *cert. denied*, 546 U.S. 892, 126 S.Ct. 211 (2005), Johnson contended he never met the attorney who represented him at trial, Eric Hessler, until the morning of trial, June 4, 2002. Johnson had previously been represented by Robert Jenkins, who appeared at other proceedings, including a pretrial motion hearing held on August 3, 2001. Johnson argued that the failure

---

[4] Defendant was represented by various counsel prior to this date.

of Hessler to meet with him prior to the immediate start of trial constituted the constructive denial of counsel during the pretrial phase of the proceedings.

In affirming the defendant's conviction and sentences, the fourth circuit discussed *Knight,*, *Laugand*, and *Addison*, noting that a continuance had been requested in those cases, and that Hessler had not made such a motion. The court further noted that nothing in the transcript or minute entries indicated that Hessler voiced any concerns that he had not known of the upcoming trial or lacked sufficient time to prepare. In addition, Johnson did not argue that Hessler was actually ineffective but that the change in counsel resulted in a constructive denial of counsel at the pretrial stage and that no prejudice need be shown. The fourth circuit further noted Johnson had been represented by counsel throughout the proceedings. The court then stated:

> As a review of the jurisprudence shows that, if Mr. Hessler had requested a continuance because he had been given the case on the eve of trial, the denial of such a request might have constituted reversible error. However, neither the record nor the jurisprudence supports a finding that a mere change in appointed counsel during the course of the proceedings constitutes the denial of counsel at the pretrial stage.

*Johnson*, 892 So.2d at 36.

In the instant matter, the record does not indicate how Williams came to enroll in the case on the morning of trial. However, there was no objection by Defendant at that time. Additionally, none of the defense counsel moved for a continuance of trial or asserted that they were unprepared to proceed to trial. Furthermore, Defendant has not argued that any of the counsel were ineffective. Based on the cases cited herein, we conclude that this assignment of error lacks merit.

19

## *Assignment of Error Number Five*

In his fifth assignment of error, Defendant contends that the videotape of C.T. was incompetent evidence which should not have been admitted at trial. Defendant contends that a competency determination should have been conducted by Joseph at the beginning of her interview with C.T., and the same criteria for competency that applies in open court should apply to the interview at issue. Defendant contends that had the interview been live testimony, it would not have passed the standards of competency outlined in *State v. Davis*, 95-801 (La.App. 3 Cir. 12/6/95), 664 So.2d 821.[5] Defendant further contends that the interview is incompetent evidence under La.R.S. 15:440.4(a)(5) because Joseph's qualifications are not set forth in the interview.[6]

In *State v. Roberts*, 42,417 (La.App. 2 Cir. 9/19/07), 966 So.2d 111, the defendant was convicted of molestation of a juvenile. At trial, a videotape of the child victim's interview regarding the alleged abuse was admitted. On appeal, the defendant argued the trial court erred in admitting the videotape into evidence because the interviewer, Latonya Hooker, was not present at trial, and the State did

---

[5] In *Davis*, the victim was questioned by the prosecutor about her ability to tell the difference between the truth and a lie, and the victim indicated that she understood the difference between telling the truth and lying, that she knew she would get in trouble if she lied, and that she must tell the truth in court.

[6] Louisiana Revised Statutes 15:440.4 provides, in pertinent part:

> A. A videotape of a protected person may be offered in evidence either for or against a defendant. To render such a videotape competent evidence, it must be satisfactorily proved:
>
> . . . .
>
> (5) That the taking of the protected person's statement was supervised by a physician, a social worker, a law enforcement officer, a licensed psychologist, a medical psychologist, a licensed professional counselor, or an authorized representative of the Department of Children and Family Services.

20

not present evidence that Detective Moreno actually supervised the interview or that she was qualified to do so. The second circuit noted that the defendant did not argue at the trial level that the State failed to present evidence that Detective Moreno was the actual supervisor of the interview or that the State failed to present evidence that she was qualified to supervise the interview. Essentially, the defendant argued that the State failed to present the proper foundation for Detective Moreno's testimony as the person who supervised the interview. The second circuit held that because it was not raised before the trial court, nor addressed by the trial court, the issue was not properly before it on appeal.

In *State v. Kennedy*, 05-1981 (La. 5/22/07), 957 So.2d 757, *reversed on other grounds*, 554 U.S. 407, 128 S.Ct. 2641 (2008), the defendant was convicted of aggravated rape. At trial, he stipulated to the admissibility of the victim's videotaped interview before it was played and expressly stated that he had no objection to the tape. Even after cross-examination, the defendant still did not object. On appeal, he argued the victim's lack of memory rendered her unavailable to testify within the meaning of the Confrontation Clause; therefore, the videotaped interview was inadmissible. The supreme court found the objection was clearly waived.

Here, Defendant did not object at the time the videotaped interview was admitted into evidence or played for the jury. Accordingly, this issue is not properly before this court for review.

**DECREE**

For the forgoing reasons, Defendant's conviction is affirmed.

**AFFIRMED.**

This opinion is NOT DESIGNATED FOR PUBLICATION.
Uniform Rules—Courts of Appeal, Rule 2–16.3.